SOUTHWESTERN TELEGRAPH & TELEPHONE CO. v. CITY OF HOUSTON et al.

(District Court, S. D. Texas, Houston Division. April 13, 1919.)

No. 108.

1. TELEGRAPHS AND TELEPHONES ☞26¾, New, vol. 7A Key-No. Series—REGULATION OF RATES—POWER OF POSTMASTER GENERAL—"POLICE REGULATIONS."

In Resolution July 16, 1918 (Comp. St. 1918, § 3115¾x), authorizing the President to assume control of the telephone and telegraph lines, provided that the existing police regulations of the several states should not be affected, which is the same proviso as used in Railroad Control Act March 21, 1918, c. 25, § 15 (Comp. St. 1918, § 3115¾o) which act by section 10 (Comp. St. 1918, § 3115¾j), gave the President power to increase rates with the consent of the Interstate Commerce Commission, "police regulations" is used in its narrow sense of regulations affecting the public safety, health, and morals, not in the broad sense of any regulation to promote the general welfare, and does not include regulation of rates, so that the Postmaster General can increase the rates without the consent of the state authorities.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Police Regulations.]

2. TELEGRAPHS AND TELEPHONES ☞26¾, New, vol. 7A Key-No. Series—CONSTRUCTION OF RESOLUTION—WAR MEASURE.

The resolution of July 16, 1918 (Comp. St. 1918, § 3115¾x), authorizing the President to assume control of telegraph and telephone lines, being a war measure, should be liberally construed.

3. STATUTES ☞228—CONSTRUCTION—PROVISO.

A proviso to a statute should be strictly construed.

4. TELEGRAPHS AND TELEPHONES ☞26¾, New, vol. 7A Key-No. Series—DISCRETION OF PRESIDENT—CONTROL BY COURTS.

The compensation to be paid the owners of telegraph and telephone lines was intrusted to the discretion of the President by the resolution of July 16, 1918 (Comp. St. 1918, § 3115¾x), authorizing him to assume control of such lines, and the Postmaster General, in making contracts therefor, acts for the President, and his decision cannot be questioned by the courts.

In Equity. Suit by the Southwestern Telegraph & Telephone Company against the City of Houston and others for an injunction. Preliminary writ of injunction ordered.

Joseph D. Frank, of Dallas, Tex., and John Chas. Harris, of Houston, Tex. (D. A. Frank, of St. Louis, Mo., of counsel), for plaintiff.
W. J. Howard and Kenneth Krahl, both of Houston, Tex., for defendants.

JACK, District Judge. The plaintiff, Southwestern Telegraph & Telephone Company, averring that it is operating a telephone system in the city of Houston as an agent and employé of Albert S. Burleson, Postmaster General, brings this suit to enjoin the defendant city of Houston, its mayor, and other officers, from interfering with plaintiff in putting into effect certain increased rates for telephone service, prescribed by the Postmaster General, acting for the President of the United States, who, under resolution of Congress, had taken posses-

sion and assumed control and supervision and was operating the said telephone system in the city of Houston. The case is now before the court on a motion for preliminary writ of injunction.

The proclamation by which the President took over the possession and control of the various telephone and telegraph systems in the United States, embodying the resolution of Congress authorizing such action, is as follows:

By the President of the United States of America.

A Proclamation.

Whereas the Congress of the United States, in the exercise of the constitutional authority vested in them, by joint resolution of the Senate and House of Representatives, bearing date July 16, 1918, resolved:

"That the President, during the continuance of the present war, is authorized and empowered, whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any telegraph, telephone, marine cable, or radio system or systems, or any part thereof, and to operate the same in such manner as may be needful or desirable for the duration of the war, which supervision, possession, control, or operation shall not extend beyond the date of the proclamation by the President of the exchange of ratifications of the treaty of peace: Provided, that just compensation shall be made for such supervision, possession, control, or operation, to be determined by the President; and if the amount thereof, so determined by the President, is unsatisfactory to the person entitled to receive the same, such person shall be paid 75 per centum of the amount so determined by the President and shall be entitled to sue the United States to recover such further sum as, added to said 75 per centum, will make up such amount as will be just compensation therefor, in the manner provided for by section 24, paragraph 20, and section 145 of the Judicial Code: Provided further, that nothing in this act shall be construed to amend, repeal, impair, or affect existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transmission of government communications, or the issue of stocks and bonds by such system or systems."

And whereas, it is deemed necessary for the national security and defense to supervise and to take possession and assume control of all telegraph and telephone systems and to operate the same in such manner as may be needful or desirable:

Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolution, and by virtue of all other powers thereto me enabling, do hereby take possession and assume control and supervision of each and every telegraph and telephone system, and every part thereof, within the jurisdiction of the United States, including all equipment thereof and appurtenances thereto whatsoever and all materials and supplies.

It is hereby directed that the supervision, possession, control, and operation of such telegraph and telephone systems hereby by me undertaken shall be exercised by and through the Postmaster General, Albert S. Burleson. Said Postmaster General may perform the duties hereby and hereunder imposed upon him, so long and to such extent and in such manner as he shall determine, through the owners, managers, boards of directors, receivers, officers, and employés of said telegraph and telephone systems.

Until and except so far as said Postmaster General shall from time to time by general or special orders otherwise provide, the owners, managers, boards of directors, receivers, officers and employés of the various telegraph and telephone systems shall continue the operation thereof in the usual and ordinary course of the business of said systems, in the names of their respective companies, associations, organizations, owners, or managers, as the case may be. *  *  *

(Remainder of proclamation not necessary to quote.)

Affidavits filed show that the telephone system of plaintiff company, hereinafter referred to as the telephone company, has been operated since the date set in the proclamation, July 31, 1918, by the Postmaster General, acting for the President, through the agency of the telephone company, as provided in the President's proclamation; that various orders concerning the management and conduct of the business have, from time to time, been issued by the Postmaster General, under whose direction the company acts, and that all moneys received from the operation of the plant are the moneys of the government; that prior to the government's taking over the property of the plaintiff company at Houston the latter had made application to the city for authority to increase its rates, the hearing on which application was concluded after the government took possession and the request had been refused; that on October 5, 1918, in accordance with the provisions of said proclamation, an agreement was entered into between the Postmaster General and the telephone company, and others constituting the Bell Telephone System, fixing the compensation which should be paid for the use by the government of such properties; that, effective January 1, 1919, the Postmaster General ordered an increase in the rates at Houston.

The city, after an ineffectual protest at a conference held at the office of the solicitor for the Postmaster General, filed suit against the telephone company for an injunction to restrain it from putting such order into effect, and the telephone company then filed the present suit, asking an injunction to prevent interference by the city and to prohibit criminal prosecution of its officers and employés under a drastic ordinance forbidding an increase of rates without authority from the city.

Under the laws of the state of Texas, the power to regulate rates of telephone corporations is delegated by statute to the municipalities in which they operate. The city's contention is that, while Congress might have granted to the President the right to establish intrastate rates, it did not do so, but reserved such right in the states by the proviso to the first section of the act, which reads:

"Provided, further, that nothing in this act shall be construed to amend, repeal, impair, or affect existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transmission of government communications, or the issue of stocks and bonds by such system or systems." Comp. St. 1918, § 3115¾x.

The authority to fix intrastate rates to be charged by public utility corporations, it is contended, falls within the police power of the states, and is therefore, under the proviso to the act, left in the states; whereas, the plaintiff contends that, while the making of rates falls within the term "police power" in its broadest sense, the term "police regulations," as used in the act, must be construed in the narrower acceptation of the term, as covering regulations affecting the safety, health, and morals of the public.

The right claimed by the Postmaster General to establish rates independent of state or municipal regulations has been challenged in a

number of jurisdictions in suits instituted by various state commissions, or municipalities, seeking injunctions, either against the Postmaster General or the telephone companies acting as his agents.

In the following cases injunctions have been refused, either because the court held that the suits were, in effect, against the government, and it was without jurisdiction, or because, in the opinion of the court, the fixing of rates was a discretionary power vested in the President, and his action in exercising such discretion was not subject to review.: State of North Dakota ex rel. Langer, Attorney General, v. Northwestern Telephone Exchange Company and Burleson, Postmaster General, United States District Court, District of North Dakota (oral opinion, not reported); Public Service Commission of Indiana v. American Telegraph & Telephone Company, United States District Court, District of Indiana (no written opinion); State of Florida ex rel. Railroad Commission v. Burleson, Postmaster General, District Court of the United States, Southern District of Florida, 258 Fed. ——; Barber v. Burleson et al., United States District Court, District of New Jersey (oral opinion, not reported); Southwestern Bell Telephone Company v. State of Oklahoma ex rel. Freeling, Attorney General, Supreme Court of Oklahoma, 181 Pac. 487; Public Service Commission v. New England Telephone & Telegraph Company, Supreme Court of Massachusetts, 122 N. E. 567; Read et al. v. Central Union Telephone Company, First District Appellate Court of Illinois; Commercial Cable Company v. Burleson, United States District Court, Southern District of New York, 255 Fed. 99; State of Mississippi ex rel. Collins, Attorney General, and Railroad Commission v. Burleson, Director General, Chancery Court, Hinds County, Mississippi; Railroad Commission of Louisiana and Coco, Attorney General, v. Cumberland Telephone & Telegraph Company, and Burleson, Postmaster General, Supreme Court of Louisiana, 82 South. ——.

In the following cases cited, injunctions were allowed: Public Utilities Commission v. Southwestern Bell Telephone Company, United States District Court, Kansas, 258 Fed. ——; Grosbeck, Attorney General, v. Michigan State Telephone Company, Circuit Court of Ingham County, Michigan, which case the Supreme Court of Michigan refused to review; State ex rel. Payne, Attorney General, v. Dakota Central Tel. Co., Supreme Court of South Dakota, 171 N. W. 277.

The question of jurisdiction is not an issue in the present case, inasmuch as it is the government, through its agent, the telephone company, which seeks relief. Thus there is squarely presented for decision the issue as to the authority of the Postmaster General, under the act of Congress, to establish rates for telephone service.

[1] The term "police power," in its broadest sense, is very difficult to define or accurately to limit. Freund in his work on that subject says:

"In the decisions of the courts we find the term police coupled with internal commerce and domestic trade; health and safety measures are commonly ascribed to it; but it is also made to include the establishment of courts of justice and the punishment of offenses, and the general tendency is to identify it with the whole of internal government and sovereignty and to regard it as an undefined mass of legislation." Page 2.

After thus describing the police power in its broadest sense, Freund defines the term in its primary or narrower sense, the sense in which plaintiff contends Congress used it in the proviso to the Telephone Act:

"The exercise of the police power for the protection of safety, order, and morals, constitutes the police power in the primary or narrower sense of the term. It is a power so vital to the community that it is often conceded to local authorities of limited powers. It is the police power in this narrower sense of the term which the Supreme Court of the United States concedes on principle to the states, even where its exercise affects interstate and foreign commerce." Page 7.

The Supreme Court has recognized this distinction. Thus, in Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923, it is said:

"The police power in its broadest sense, includes all legislation and almost every function of civil government."

In the cases of Western Union Telegraph Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187, and Western Union Telegraph Co. v. Foster, 247 U. S. 105, 38 Sup. Ct. 438, 62 L. Ed. 1006, the court refers to the police power as "an ambiguous term." It clearly had in mind the term in its broader sense.

In the case of Manigault v. Springs, 199 U. S. 481, 26 Sup. Ct. 130, 50 L. Ed. 274, involving the right of a state, in the absence of legislation by Congress, to authorize the construction of dams across interior streams, though previously navigable to the sea, the Supreme Court clearly recognizes this distinction in the police power in its broader sense, and in its primary or narrower sense:

"It only remains to consider," said the court, "in connection with this branch of the case, whether the act of the General Assembly of 1903 was a proper exercise of the police power of the state. Of this we have no doubt. Although it was not an exercise of that power in its ordinarily accepted sense of protecting the health, lives, and morals of the community, it is defensible in its broader meaning of providing for the general welfare of the people."

In determining in which of these senses Congress used the term in the act authorizing the taking over and operation of radio, cable, telegraph, and telephone systems, reference to the previous legislation relative to the taking over and operation by the President of the railroads will be of some assistance.

This authority by which the President took possession of the railroads was a short paragraph in the Army Appropriation Act of August 29, 1916, c. 418, § 1, 39 Stat. 645 (Comp. St. 1918, § 1974a), as follows:

"The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable."

This, as stated by the President when he went before Congress in joint session January 4, 1918, was sufficient for all purposes of administration, but it was desired that some guaranty from the government to the owners and creditors of the railroads should be given that their

properties would be maintained in good condition, and that they would receive just compensation for their use.

In order to make proper provision for such compensation, to the railroad companies, and to make certain provisions for the continued operation of the railroads, the supplemental Act of March 21, 1918, c. 25 (Comp. St. 1918, §§ 3115¾a–3115¾p), known as the Federal Railroad Control Act, was passed.

Section 10 of this act provides that the President, when in his opinion the public interest requires, may initiate rates and fares by filing the same with the Interstate Commerce Commission, leaving to such commission the final right to pass on their justness and reasonableness. This clause added nothing to the President's authority. The right to operate, granted by the first act, necessarily carried with it the right to fix rates, and this provision of the second or supplementary act, so far from broadening the President's authority, placed on it a restriction—the necessity for approval, in case of complaint, of the Interstate Commerce Commission. It will be noted that no distinction is made between interstate rates and intrastate rates. The Interstate Commerce Commission is composed of men, by long training, expert in the technical knowledge needful in rate making, and so Congress very properly provided that this commission, of its own creation, should share with the President the authority and responsibility of initiating new rates, when such rates were charged to be unjust or unreasonable. Congress was not willing, however, to leave to the various state Railroad Commissions the power to regulate intrastate rates.

Section 15 of the act is as follows:

"That nothing in this act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds." Comp. St. 1918, § 3115¾o.

This provision of the Railroad Act was copied bodily into the Telephone Act, with only the slight change, substituting for "except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds," the phrase, "except wherein such laws, powers, or regulations, may affect the transmission of government communications or the issue of stocks and bonds by such system or systems."

In the Railroad Act there was a provision for the issuance of bonds and other securities by the railroad companies, with the approval of the President; hence the exception in the proviso contained in section 15, relative to stocks and bonds. In the Telephone Act there is no similar provision relative to bonds; hence, in the Telephone Act, this provision is rather meaningless. It has no connection whatever with the police power, and may be regarded as surplusage.

Inasmuch, then, as a prior section of the Railroad Act expressly recognizes the right of the President to fix rates under the conditions therein named, had it been considered that the fixing of rates fell within "the lawful police regulations of such states," Congress should have

added to the exception in the proviso in section 15, "except as herein-before provided," or other phrase to that effect. The absence in the exception to the proviso of any reference whatever to the provision previously incorporated in the act relative to the fixing of rates by the President, suggests the inference that Congress used the term "police regulations" in its primary or narrow, rather than in its broader, sense, and hence that such police power of the states was not encroached upon by vesting in the President such authority to make rates.

It will be noted that practically the same language used in the paragraph in the Army Appropriation Bill of August 26, 1916, c. 418, 39 Stat. 619, authorizing the President to take over and operate the railroads, was incorporated in the resolution authorizing the President to take over and operate the telephone lines, and if the former act carried with it the authority to fix rates, the latter would likewise, unless such authority was withdrawn or excluded by the proviso. This proviso, however, is in the same terms as the corresponding clause in the supplementary railroad legislation, which, it is clear, was not intended to take from the President this power, by implication necessarily included in the original law (Army Appropriation Act), and expressly recognized, with certain limitations, in the supplementary legislation. If, then, it was not intended by the proviso in the Railroad Act to leave to the states the right to fix rates, it naturally follows that neither was such the intention of Congress in including a similar proviso in the Telephone and Telegraph Act.

[2, 3] The act authorizing the taking over of the telegraph and telephone lines, being a war measure, should be liberally construed; whereas, even in times of peace, any proviso to an act, under the general rules of construction, should be strictly construed. Lewis' Sutherland, Stat. Const. vol. 2 (2 Ed.) pp. 670, 671, 674, 675.

In determining the intention of Congress, we should bear in mind its vast power in time of war and public peril. In Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281, the Supreme Court of the United States said:

"Congress has the power, not only to raise and support and govern armies, but to declare war. It has, therefore, the power to provide by law for carrying on war. This power necessarily extends to all legislation essential to the prosecution of war with vigor and success, except such as interferes with the command of the forces and the conduct of campaigns. That power and duty belong to the President as Commander-in-Chief. * * *

"The power to make the necessary laws is in Congress; the power to execute in the President. Both powers imply many subordinate and auxiliary powers. Each includes all authority essential to its due exercise."

Again, in the Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287:

"It is absolutely essential to independent national existence that government should have a firm hold on the two great sovereign instrumentalities of the sword and the purse, and the right to wield them without restriction on occasions of national peril. In certain emergencies government must have at its command, not only the personal services—the bodies and lives—of its citizens, but the lesser, though not less essential, power of absolute control over the resources of the country. Its armies must be filled, and its navies manned, by the citizens in person. Its material of war, its munitions, equipment, and commissary stores, must come from the industry of the country."

Congress, in its declaration of war with Germany and with Austria-Hungary, had declared that the President was authorized and directed to employ the entire naval and military forces of the United States and the resources of the government to carry on the war, and that, to bring the conflict to a successful termination, all of the resources of the country were pledged.

It accordingly had enacted a mass of legislation for the raising and equipping of an army and for the husbanding and marshaling of the resources of the nation. It had authorized the taking over of the railroads, and the President, in his proclamation taking possession, had said:

"This is a war of resources, no less than of men, perhaps even more than of men, and it is necessary for the complete mobilization of our resources that the transportation system of the country should be organized and employed under a single authority and a simplified method of co-ordination which have not proved possible under private management and control."

The signing of the armistice did not terminate the war. We are still at war, although active hostilities have been suspended, and may not be renewed. This Telephone Act, however, must be interpreted in the light of conditions as they existed at the time of its passage by Congress, when the enemy was making a last desperate drive on Paris, when American soldiers were being sent to France as fast as transports could be provided to carry them, and when the vast resources of the nation, pledged by Congress, were being thrown into the balance to insure victory for the Allies. Can it be that at such a time Congress, in authorizing the taking over and operation of the telephone system, intended to hamper and embarrass the President in its operation, by denying to him the right to fix rates?

In the Railroad Control Act, Congress had anticipated the probable necessity for an increase in rates, and had provided that the Interstate Commerce Commission should have the authority to pass on their justness and reasonableness. Was there any less reason for anticipating the fact that there might likewise be need for an increase in telegraph and telephone rates to meet a higher cost of labor and of materials needed in the maintenance and operation of the telegraph and telephone systems? No appropriation was made by Congress to cover such a contingency, and it must therefore be presumed that it intended that the rates should be increased whenever, because of conditions over which the President had no control, the telephone system could not be operated on the then existing rates. If more money is needed to operate the telephone system, it must be furnished, either by Congress or by an increase in the rates. Certainly it was not intended that the government, in such event, should default on its obligation to the telephone companies, nor that the President should return the properties to the owners before such time as he should deem their continued operation by the government no longer necessary for the national security or defense.

[4] It is no answer to say that these lines should be operated by the government at no greater cost than they were operated by the owners, or that in this particular case the compensation agreed on by the Post-

master General and the telephone company was too much. The President, acting through the Postmaster General, may or may not have made a good contract. The authority to enter into such a contract involved the exercise of his own judgment, and where such discretion is vested in the President, the courts have no authority to inquire whether or not he acted wisely or to the best advantage. They may not substitute their judgment for his.

As was said by the Supreme Court as far back as Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60:

"By the Constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.

"In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, the decision of the executive is conclusive."

The court, in the same case, recognized the distinction in cases where the representative of the President acts in a matter requiring the exercise of discretion, and where his duties are purely ministerial:

"The conclusion from this reasoning is that, where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy."

The latest expression of the Supreme Court on the subject is in Louisiana v. McAdoo, 234 U. S. 633, 34 Sup. Ct. 941, 58 L. Ed. 1506, in which the court said:

"There is a class of cases which holds that if a public officer be required by law to do a particular thing, not involving the exercise of either judgment or discretion, he may be required to do that thing upon application of one having a distinct legal interest in the doing of the act. Such an act would be ministerial only. But if the matter in respect to which the action of the official is sought is one in which the exercise of either judgment or discretion is required, the courts will refuse to substitute their judgment or discretion for that of the official intrusted by law with its execution. Interference in such a case would be to interfere with the ordinary functions of government. Marbury v. Madison, 1 Cranch, 137 [2 L. Ed. 60], Kendall v. United States, 12 Peters, 524, 610 [9 L. Ed. 1181], United States v. Schurz, 102 U. S. 378 [26 L. Ed. 167], are examples of instances where the duty was supposed to be ministerial. Cases upon the other side of the line are Decatur v. Paulding, 14 Peters, 497, 514, et seq. [10 L. Ed. 559, 609]; Mississippi v. Johnson, 4 Wall. 475 [18 L. Ed. 437]; Cunningham v. Macon, etc., Railroad, 109 U. S. 446 [3 Sup. Ct. 292, 609, 27 L. Ed. 992]; United States ex rel. Dunlap v. Black, 128 U. S. 40 [9 Sup. Ct. 12, 32 L. Ed. 354]; United States ex rel. v. Lamont, 155 U. S. 303 [15 Sup. Ct. 97, 39 L. Ed. 160]; Roberts v. United States, 176 U. S. 221 [20 Sup. Ct. 376, 44 L. Ed. 443]; Riverside Oil Company v. Hitchcock, 190 U. S. 316 [23 Sup. Ct. 698, 47 L. Ed. 1074]; Ness v. Fisher, 223 U. S. 683 [32 Sup. Ct. 356, 56 L. Ed. 610]."

It may be true, as contended by counsel, that the various state commissions and city councils claiming authority to regulate intrastate rates might, on proper showing made, authorize the government, as they might previously have authorized the telephone companies, to increase established rates, and that, if the rates as fixed by such bodies were confiscatory, relief might be sought in the courts. It is answered that these state laws authorizing the regulation of rates contemplated private ownership of these utilities, and their purpose was to prevent any advantage being taken of the public.

No such reason would exist, were the operation by the state itself, nor does it exist where the operation of these utilities is by the government. As well might a state commission, which has authority to regulate intrastate rates of express companies, claim the same right to regulate intrastate rates which the Government charges for parcel post service. Neither the parcel post nor the telegraph and telephone lines are being operated for financial gain. The former is for the convenience of the public; the latter as a war measure for the safety of the nation. Congress could not have intended that a state commission or a city council should have the authority to say to the government of the United States what rates it might charge for telephone service. If the city of Houston may do so, then likewise may every town and city in the state of Texas, and every town and city in every other state where the Legislature has delegated such authority to its municipal corporations. Such a condition would cause confusion and chaos, and would make utterly impossible any equality or uniformity of rates. It would be incompatible with the power and dignity of the national government. It is inconceivable that the nation in the conduct of a business taken over and made its own as a war measure, should, before fixing the rates to be charged, have to obtain the permission of any municipal council or state commission. It follows that in the proviso to the Telegraph and Telephone Act Congress used the term "lawful police regulation" in the ordinary sense in which the words are understood, and not in the broad sense which would include the authority to fix rates of public utilities.

The plaintiff is entitled to a preliminary writ of injunction as prayed for; and it is so ordered.