### SOUTHWESTERN TELEGRAPH & TELEPHONE CO. v. CITY OF HOUSTON.

(District Court, S. D. Texas.   September 4, 1920.)

No. 108.

1. **Equity 409—Findings' of master not conclusive in suit to enjoin enforcement of state statute.**

In a suit to enjoin enforcement of a state statute or municipal ordinance on constitutional grounds, the court must exercise its own judgment, unfettered by artificial rules, and cannot be concluded by findings of fact made by a master.

2. **Telegraphs and telephones 33 (1)—Valuation for fixing rates.**

The value of the property of a public service corporation, as a telephone company, for the purpose of determining the reasonableness of rates, is to be taken as of the time of the inquiry, with allowance for increase or decrease in value above or below its original cost, and considering, also, the cost of reproduction.

3. **Telegraphs and telephones 33 (1)—Contract fixing valuation for rate purposes.**

A contract embodied in a city ordinance, permitting the merger of two telephone companies and its acceptance, providing that there should be no increase in rates unless necessary to permit the new company to earn a

fair return on "its capital actually invested" in the local plant, where fully executed by acceptance of the ordinance and taking over and operating the property, *held* binding on the company, and to fix the valuation on which it was entitled to earn a fair return.

4. **Telegraphs and telephones ☞33(1)—Valuation for rate purposes limited by contract.**

Where a contract between a city and a telephone company, made by an ordinance and its acceptance, fixed the valuation of the company's property for rate purposes as "its capital actually invested" in the plant, no addition can be made to such valuation for going concern value of the plant.

5. **Telegraphs and telephones ☞33(1)—"Working capital."**

The "working capital," on which a telephone company is entitled to earn a fair return, in addition to the value of its physical property, is the amount of cash and supplies necessary to be kept on hand to meet current expenses and contingencies as they arise in the proper conduct of the business.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Working Capital.]

6. **Telegraphs and telephones ☞16—Contracts with controlling corporation for supplies held not invalid.**

Contracts under which complainant telephone company paid the American Telephone & Telegraph Company for apparatus and services in accounting and laboratory work, and a supply company for apparatus and supplies, practically all of the stock of both complainant and the supply company being owned by the American Company, *held* not invalid, in the absence of evidence that the prices paid were excessive or that they were not advantageous to complainant.

7. **Telegraphs and telephones ☞33(1)—Ordinance rates held confiscatory.**

Rates for service by a telephone company fixed by ordinance *held* confiscatory and not enforceable, and the company *held* entitled to an increase which would enable it to earn a net return of 8 per cent. on the capital invested.

In Equity. Suit by the Southwestern Telegraph & Telephone Company against the City of Houston. Decree for complainant.

See, also, 256 Fed. 690.

D. A. Frank, of St. Louis, Mo., Joseph D. Frank and William H. Duls, both of Dallas, Tex., and John Charles Harris, of Houston, Tex., for plaintiff.

W. J. Howard and Kenneth Krahl, both of Houston, Tex., for defendant.

JACK, District Judge. In 1909 the city of Houston passed an ordinance fixing local telephone rates under which plaintiff company operated until 1915, when it acquired, by purchase and merger, the property of the Houston Home Telephone Company. The ordinance authorizing the merger, duly accepted by the plaintiff company, contained the following provision as to future increases in rates:

"The Southwestern Telegraph & Telephone Company agrees that it will not increase rates as at present charged by it for service in the city of Houston, unless it appears upon a satisfactory showing to be made before the city council of the city of Houston, of all receipts and disbursements, and said showing must, in order to justify or warrant a raise in the rates, reasonably

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

prove that there exists a necessity for an increase of charges in order that said company may earn a fair return upon its capital actually invested in the Houston plant; and it is agreed for a term of five years from this date that a fair return upon said capital and investment is not less than 7 nor more than 8 per cent."

In December, 1917, plaintiff made application to the city council for authority to put in effect a schedule of increased rates. Hearings were had, but no final action on the application was taken by the council. In August, 1918, the federal government took control of all the properties of the defendant company, including the Houston exchange, and continued to operate the same through the Postmaster General, who, in February, 1919, adopted the proposed new schedule of rates. To avoid prosecutions, under the old ordinance of 1909, the telephone company as agent for the Postmaster General, brought suit against the city to enjoin it from seeking to enforce the old rates. This court granted the injunction, holding that, the property being operated by the President, through the Postmaster General, as a war measure authorized by Congress, his right to increase rates could not be questioned by defendant. 256 Fed. 690.

On July 31, 1919, the United States returned its property to the telephone company, and promptly thereafter the mayor of the city notified the company that, the injunction granted having become inoperative, the city would insist upon a return to the schedule of rates prescribed by the ordinance of 1909, whereupon plaintiff filed an amended and substituted bill, seeking an injunction on the allegations that the schedule of rates fixed by the ordinance of 1909 would not yield, and had for several years past not yielded, revenue in excess of the operating expenses, and that such ordinance was confiscatory of its property and in violation of the Fourteenth Amendment of the federal Constitution, forbidding the taking of property without due process of law.

With instructions to take the evidence and report his findings of fact and conclusions of law, the case was referred to Julian Llewellyn, special master, who, in a carefully prepared and well-considered report, found that the ordinance was confiscatory, and that its enforcement should be enjoined. The case is now before the court on defendant's exceptions to the master's report.

[1] The consideration and effect to be given by the court to the findings of fact by the master in a case of this kind, involving the public interest, is well expressed by Mr. Justice Moody in Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371:

"At the threshold of the consideration of the case the attitude of this court to the facts found below should be defined. Here are findings of fact by a master, confirmed by the court. The company contends that under these circumstances the findings are conclusive in this court, unless they are without support in the evidence or were made under the influence of erroneous views of law. We need not stop to consider what the effect of such findings would be in an ordinary suit in equity. The purpose of this suit is to arrest the operation of a law on the ground that it is void and of no effect. It happens that in this particular case it is not an act of the Legislature that is attacked, but an ordinance of a municipality. Nevertheless, the function of rate-making is purely legislative in its character, and this is true, whether it is exercised

directly by the Legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated. The completed act derives its authority from the Legislature, and must be regarded as an exercise of the legislative power. * * * There can be at this day no doubt, on the one hand, that the courts on constitutional grounds may exercise the power of refusing to enforce legislation, nor, on the other hand, that that power ought to be exercised only in the clearest cases. The constitutional invalidity should be manifest, and where that invalidity rests upon disputed questions of fact the invalidating facts must be proved to the satisfaction of the court. In view of the character of the judicial power invoked in such cases it is not tolerable that its exercise should rest securely upon the findings of a master, even though they be confirmed by the trial court. The power is best safeguarded against abuse by preserving to this court complete freedom in dealing with the facts of each case. Nothing less than this is demanded by the respect due from the judicial to the legislative authority. It must not be understood that the findings of a master, confirmed by the trial court, are without weight, or that they will not, as a practical question, sometimes be regarded as conclusive. All that is intended to be said is that in cases of this character this court will not fetter its discretion or judgment by any artificial rules as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation. We approach the discussion of the facts in this spirit."

The rule is well established that rate-making bodies must allow such a rate to public service corporations as will yield a fair return upon a reasonable value of its property used for the public. The total value of the property the master found to be, in round figures, as follows: Value of physical property, $5,000,000; going concern value, $765,000; working capital, $238,000; total, $6,003,000. The defendant excepted to this finding, claiming that the valuation should have been as follows: Physical property, $2,750,000; going concern value, $50,000; working capital, $100,000; total $2,900,000.

## Physical Property.

[2] Under the general rule, as stated by the Supreme Court in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, the value of the property is to be determined as at the time when the inquiry is made regarding the rates. If the property which legally enters into the consideration of the question of rates has increased in value since it was acquired, the company is entitled to the benefit of such increase. In the Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the court said:

"It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law. * * * The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. The scope of the inquiry was thus broadly described in Smyth v. Ames, 169 U. S. 546, 547: 'In order to ascertain that value, the original cost of construction, the amount expended in permanent improve-

ments, the amount and market value of its bonds and stock, the present, as compared with the original, cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.' "

With the high cost of labor and material, caused by the war, and which still prevails, the cost of reproduction of the plant would be far in excess of the original cost. Taking into consideration the cost of reproduction, the original cost, and these various elements which the courts have held should be included, the master found the value of the physical property to be $5,500,000, from which he deducted $500,000 for depreciation, leaving a net valuation of $5,000,000, whereas the actual cost of the property, as shown by the company's books, was $4,571,567.

[3] While under the general rule, and in the absence of any agreement to the contrary, both the cost of reproduction and the original cost must be considered in fixing present value, the present case is exceptional, in that, by the terms of the ordinance permitting the plaintiff company to purchase a competing telephone exchange in Houston, it is specifically provided that an increase of rates shall be permitted only when necessary to permit the company to earn a fair return, not upon the value of its property, but upon "its capital actually invested in the Houston plant." Thus, by the terms of its contract with the city, the telephone company has specifically waived its right to claim anything more than a fair return on its capital actually invested, which is the actual cost of the property.

It is true, as held by the master, that a municipal corporation under the Constitution and laws of Texas may not bargain away its right to fix rates (San Antonio v. Altgelt, 200 U. S. 304, 26 Sup. Ct. 261, 50 L. Ed. 491), and it may be that it cannot bind itself by an agreement that the basis of valuation on which rates may be fixed shall be other than that which the courts have held to be the legal basis. Had the contract, evidenced by the ordinance and its acceptance, been attacked on this ground while yet executory, it may be that the courts would have annulled it for want of mutuality, but the contract is no longer executory. It has been executed; the plaintiff company has long since taken over and absorbed the property of the competing company, and it is now estopped from disavowing the agreement at the time made by it as a substantial part of the consideration for the city's consent to a merger of the two corporations. I therefore think that the master erred in treating as of no effect this provision of the ordinance.

[4] The physical value of the property on which plaintiffs is entitled to receive a fair return is the value as shown by the books, $4,571,567.

### Going Concern Value.

In the Des Moines Gas Co. v. City of Des Moines, 238 U. S. 165, 35 Sup. Ct. 811, 59 L. Ed. 1244, the Supreme Court held:

"That there is an element of value in an assembled and established plant doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use."

See, also, Denver v. Denver Union Water Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649.

The master's inclusion of a going concern value, under authority of these cases, would have been proper, though I do not think it should have been fixed in excess of one-half of the amount named, had it not been for the plaintiff's agreement, in accepting the merger ordinance, that the sum on which it should receive a fair return should be the capital actually invested, which is equivalent to the actual cost of the plant, plus the working capital.

In the statements previously filed with the city of the valuation of its property, it does not appear that any going concern value had been included, and it seems clear that none was contemplated in the merger ordinance. Over $1,000,000 of the capital actually invested by plaintiff company, as shown by its books, on which it is entitled to receive a fair return, represents the price paid for the plant of the Houston Home Company, and, as the latter was at the time a going concern, that price included its going concern value. If now the going concern value of the merged corporations be included in the sum on which a fair return is to be paid, it is evident that there would be twice included the going concern value of the Houston Home Company property.

The cost of creating such going concern value was paid as expenses of operation out of the revenues of the company, much of it since 1909. When the council, in that year, fixed the present schedule of rates, as to which no complaint was made by the company until December, 1917, it must be presumed that the council gave full consideration to all operating expenses in determining a fair rate. Such expenses, so paid out of the company's revenues, cannot be said to be "capital actually invested," and should not be included in the total valuation on which plaintiff is entitled to receive a fair return.

### Working Capital.

[5] By working capital is meant the amount of cash and supplies necessary to be kept on hand, to meet current expenses and contingencies, as they arise, in the proper conduct of the business. The master allowed, on this item, $238,000, being the proportion of the total estimated operating capital of the company at all of its exchanges in Texas allocated to Houston, as figured and estimated by one of the plaintiff's witnesses.

The plaintiff renders bills in advance to its subscribers. Its average monthly expenditures are about $80,000, so that, if every subscrib-

884 268 FEDERAL REPORTER

er were a month and a half late in settling his bill, a working capital of $80,000 would ordinarily suffice. Making due allowance for emergencies and unforeseen expenses, I think that $120,000 would be a liberal allowance for working capital, and that the finding of the master should be reduced from $238,000 to that sum.

## Income and Expenses.

There is no dispute as to the amount of plaintiff's revenue actually received at the Houston exchange during 1919, nor is there any question as to the master's finding of the expenses paid out for the same period, though exception was taken to allowance of 6.33 per cent. reserve for depreciation. The total revenues, less excess collected over the old rates while the property was operated by the government, aggregated $908,258, while the expenses, including reserve for depreciation, totaled $1,214,462, leaving a deficit of $306,204.

## Division of Long-Distance Tolls.

It is contended by the defendant that the plaintiff, who owns certain toll lines running out of Houston, has not credited to the Houston exchange its just proportion of toll receipts for long-distance messages. The proportion so credited is 25 per cent. on all long-distance tolls collected in Houston, which the master found was greater than that allowed any one of the 8 independent exchanges in the state by independent long-distance toll lines with which they connect, that the rate is the same as that allowed the Houston exchange by independent long-distance lines running into Houston, and that the rate is larger than that paid by the plaintiff company to over 300 independent exchanges. Furthermore, 25 per cent. to the exchange, the master found, is the customary allowance made by state commissions throughout the country, and that it is not practical to segregate the cost of handling long-distance messages as between local exchanges and long-distance lines. The court will sustain the division, as the usual and customary one. See Cumberland Telephone & Telegraph Co. v. Louisville (C. C.) 187 Fed. 637.

## American Telephone & Telegraph Company.

[6] Plaintiff's telephone supplies are purchased from the Western Electric Company, practically all of whose stock is owned by the American Telephone & Telegraph Company, which likewise owns 99 and a fraction per cent. of the stock of plaintiff company. The American Telephone & Telegraph Company has a contract with the plaintiff by which it furnishes certain telephone apparatus and renders certain service in accounting and laboratory work, for which it is paid 4½ per cent. of plaintiff's gross operating revenues. The amount paid for this service is claimed by plaintiff to be excessive as are likewise alleged to be the prices charged by the Western Electric Company. It is furthermore contended that such service by the American Telephone & Telegraph Company should be rendered at cost, and that the evidence offered fails to show what was such actual cost. The master, after careful consideration of the mass of conflicting testi-

mony, held against such contentions of the plaintiff, and found that the plaintiff gets full value for the amount of money paid the parent company, and unqualifiedly approved the 4½ per cent. payment, which in 1919 aggregated $43,528.

As to the nature of the service rendered, the master quotes with approval from the Supreme Court of Michigan in the case of Detroit v. Railroad Commission and State Telephone Company, 177 N. W. 306, started April 10, 1920, in which that court quotes with approval the opinion of the Railroad Commission of Michigan, as follows:

"The American Telephone & Telegraph Company, itself a large corporation, financed by the issuance of its own securities, and occupying the same relative position to telephone companies of several other states, is able with practicability to, and does, maintain extensive laboratories and offices, where careful experiments are constantly being made, designed to produce improvements and economies in the service. It employs engineers, accountants, auditors, and others, whose services are highly beneficial to telephone companies, whose employment would be impossible to any of these associated companies individually. The cost to any individual company of maintaining a staff of skilled assistants of like character and ability would be prohibitive; yet under this arrangement the Michigan State Telephone Company now has the benefit of all that these men do or produce in the way of improvements, refinements, or economies in telephone facilities, service, or methods of operation. True, the results of the investigations and experiments of these men, once they are achieved, may be given to many associated companies as readily as to one; but that does not lessen the value of them to any one of the associated companies. The Michigan State Telephone Company's securities are taken and handled by the American Telephone & Telegraph Company at uniformly low interest rates and without large discounts. This service is one the value and importance of which it is impossible to calculate.  *  *  *  The effect of this arrangement is that the state company is given the benefit of the services of the most efficient engineers, accountants, traffic men, patent lawyers, and others possible to secure. They are furnished with certain standard parts of all telephone sets, which are kept in repair for them. They are aided in their financial matters extensively. These are services which the company needs, which are useful to it, inuring to the benefit of its patrons, which, if they could otherwise be had at all, certainly would not be obtained at any less cost than under their contract with the American Telephone & Telegraph Company. It is apparent that this contract should receive the approval of the commission.  *  *  *  It follows, in the opinion of the commission, that unless the contracts between the Michigan State Telephone Company and the American Telephone & Telegraph Company, under which certain facilities are furnished and certain engineering, accounting, and other services are rendered to the Michigan State Telephone Company, and between the Michigan State Telephone Company and the Western Electric Company, under which the applicant company purchases certain of its supplies and materials, amount to a fraud upon the public by reason of the price paid by the Michigan State Telephone Company being excessive, then the disbursements of the Michigan State Telephone Company, in pursuance of these contracts, must be considered legitimate and proper charges upon its revenues. It was made to appear upon the hearing before the commission by Mr. Burch that the prices and terms at which the Western Electric Company furnished property and facilities to the Michigan State Telephone Company were very favorable, that the facilities furnished by the Western Electric Company were a good standard, the world over, and furnish an excellent basis for fixing unit prices."

The scope of the inquiry in this case cannot be extended to the determination of a fair rate of profit to the American Telephone & Telegraph Company on its capital invested, or to such a rate of profit to the Western Electric Company, which is not a public service corpora-

tion, but a private corporation engaged in the business of manufacturing telephone apparatus. The problems presented by the relations of such holding and subsidiary corporations are serious ones, which vitally affect the public interest, but they are problems which primarily call for legislative consideration.

The fact that the American Telephone & Telegraph Company dominates and controls both the plaintiff company and the Western Electric Company is sufficient to cause the courts to very closely scrutinize any dealings between these corporations whereby any unjust advantage might be taken by the parent company, or the effect of which might be to enable it to receive a larger return than that which forms the basis of the established rate for telephone service to the public. Such corporations, however, are not debarred from entering into contracts with each other, and where such contracts are fair and advantageous to the subordinate corporation, they will be recognized and given effect.

### Reserve for Depreciation.

The plant's present condition, according to witnesses, is 92 per cent. perfect; 'that is to say, with the replacements which have from time to time been made, there is only a general depreciation now existing of 8 per cent. The company has not shown the actual amount paid out for replacements prior to 1909, when it first began a system of bookkeeping so as to show such costs. The realized depreciation for 1909 to 1917 is shown to have been only 4 per cent. of the book cost of the plant, but this does not cover replacements which will in the future have to be made, such as central office equipment, buildings, underground cable, etc. During 1918 and 1919, while the property was being administered by the government, a reserve of 5.72 per cent. was allowed for depreciation. The usual amount of replacements were not actually made during government control, because of the war and the priority given to war industries. The 6.33 per cent. reserve allowed by the master for depreciation would, I think, be too much, if figured on the value of the plant, not including depreciation, as was done; but if the percentage be taken on the book value, which under the merger contract should govern, I think it would, under present conditions, be a proper allowance.

### Return on Capital Actually Invested.

[7] The master found that 8 per cent. under present conditions would be a fair return. In Lincoln Gas & Electric Co. v. City of Lincoln, 250 U. S. 256, 59 Sup. Ct. 454, 63 L. Ed. 968, the court said:

"It is a matter of common knowledge that, owing principally to the World War, the cost of labor and supplies of every kind has greatly advanced since the ordinance was adopted, and largely since this case was last heard in the court below; and it is equally well known that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested in gas plants or similar public utilities a few years ago furnishes no safe criterion for the present or for the future."

A return of 8 per cent. is, I think, under present conditions, a fair one, if restricted, as it should be, to the capital actually invested.

Summarizing, the capital actually invested, on which plaintiff is entitled to receive a fair return, is as follows:

Value of physical property.................................$4,571,567.00
Working capital ...........................................  120,000.00
                                                           ──────────────
                                                            $4,691,567.00

It should receive on this a net return of 8 per cent., or $375,325. Instead of receiving such income, under the master's findings of revenues and expenses, it sustained a loss during the year 1919 of $306,-204. This includes an allowance of $348,150 for depreciation, being 6.33 per cent. of $5,500,000. Substituting for $348,150, $289,380, being the same percentage on the actual cost, would reduce the excess of expense over revenue to $247,434, net loss for 1919. It follows that the said ordinance of 1909 is confiscatory of plaintiff's property and in violation of the Fourteenth Amendment of the federal Constitution, prohibiting the taking of one's property without due process of law. The master's findings, except as otherwise stated, are approved. A decree will be prepared and presented in accordance with the views herein expressed.

The findings of the court on the questions of fact herein presented are intended as a guide to the city council in enacting a new ordinance establishing a new schedule of rates. The court's decision relates only to the present. A year hence conditions may so change as to warrant a further increase or a decrease in rates. The decree will be without prejudice to either party, should conditions hereafter justify, to petition the court to rescind its injunction, or to grant such relief as may be necessary or needful under such changed conditions, and to that end the court will retain jurisdiction.