## GRIGSBY et al. v. SOUTHERN RY. CO.

(Circuit Court of Appeals, Sixth Circuit. March 4, 1925.)

No. 4083.

**1. Commerce** ⬚⇒27(7) — **Brakeman, while switching, held not employed in "interstate commerce" at time of death.**

Brakeman of train of empty coal cars, who was killed while switching after interstate car had been dropped, *held* not engaged in "interstate commerce," within the federal Employers' Liability Act (Comp. St. §§ 8657–8665), though one of cars switched was subsequently billed as interstate, and though other interstate cars were subsequently picked up by train on return trip.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

**2. Commerce** ⬚⇒27(6)—**Outgoing trip to distribute empty cars, and return trip to pick up loaded ones held separate, though made pursuant to one order.**

Where the original trip is made to distribute empty cars, and the return trip to pick up loaded cars, each is distinct and separate, though both trips are made pursuant to one order.

In Error to the District Court of the United States for the Eastern District of Tennessee.

Action by S. C. Grigsby and D. G. Devault, administrators of the estate of R. L.

Grigsby, deceased, against the Southern Railway Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

W. T. Kennerly, of Knoxville, Tenn., for plaintiffs in error.

Charles H. Smith, of Knoxville, Tenn., for defendant in error.

Before DENISON and MACK, Circuit Judges, and ROSS, District Judge.

MACK, Circuit Judge. [1] The only contested question presented on this record in the trial court and in this court is whether or not the deceased, who was killed while acting as a freight brakeman for defendant, was at the time engaged in interstate transportation so as to bring the case within the federal Employers' Liability Act (Comp. St. §§ 8657–8665). The trial judge, after fully and accurately stating the pertinent facts and the basis for his deduction therefrom, directed a verdict for defendant. We summarize these facts as follows:

On the morning of the accident a train left Coal Creek, Tenn., with a caboose, 15 empty coal cars, and a car containing interstate merchandise, under orders to drop the loaded car destined for La Follette, Tenn., at Vasper, a junction point, to proceed on to Turley, Tenn., distributing the empty coal cars at several mines on the way, and to return in the afternoon from Turley, picking up between Turley and Vasper any loaded cars ready for shipment. The merchandise car was accordingly dropped at Vasper. Proceeding on with the empties, it became necessary at one point to switch some seven loaded coal cars in order to get the empties in place for the mines. At the time of the switching, four of these seven cars were billed intrastate; the other three were not yet billed. In the afternoon, however, these three were also billed—two intrastate and one interstate. This billing, however, was done after the original run to Turley had been completed.

During the switching operations, Grigsby was killed by the fall of a large lump of coal from one of the two cars that in the afternoon was billed intrastate, but that at the time of the accident had not yet been billed. On the return trip from Turley to Vasper the train picked up loaded coal cars, some billed interstate and some intrastate. It did not, however, pick up the two intrastate and the one interstate hereinabove referred to; these were picked up by some other train.

At Vasper, pursuant to orders then and there received, the engine in question again picked up the interstate merchandise car and certain empty coal cars, temporarily dropping the loaded coal cars which it had hauled from mines between Turley and Vasper on the return trip from Turley. It hauled the merchandise car and these empties to La Follette, and after delivering them there, again pursuant to orders then and there received, took loaded coal cars from La Follette, via Vasper, to Coal Creek, picking up again at Vasper the loaded coal cars that it had temporarily dropped there. But for the new orders received at Vasper on the return trip, and again at La Follette, neither the trip from Vasper to La Follette nor the return trip from La Follette would have been made.

Under the requirements of the Interstate Commerce Commission and pursuant to the forms adopted by it, the movements above described were reported as four distinct trips, from Coal Creek to Turley, from Turley to Vasper, from Vasper to La Follette, and from La Follette, via Vasper, to Coal Creek. In each of these reports a statement is made of the entire consist as to the specific trip so reported; that is, the engine, caboose and specific cars hauled. The journey itself from Coal Creek to Turley, back to Vasper, thence to La Follette, and thence, via La Follette, to Coal Creek, was intrastate, whether viewed as one trip or as several independent trips; that is, the entire journey was within the state of Tennessee. Nevertheless, its character may be and was temporarily affected by reason of the fact that some of the cars hauled were interstate. That fact gave the train the character of an interstate train, at least during certain periods. The exact question before us is whether that temporary character prevailed at the time of the accident.

When the train started from Coal Creek it was an interstate train, because the car loaded with interstate merchandise was being hauled. When this car was dropped at Vasper, not temporarily, but, so far as was then known, and except for fresh orders subsequently received, definitely and permanently disengaged from this train, and when the train proceeded toward Turley, carrying only empty cars to be distributed at the mines on the way, it was clearly an intrastate train, unless the later happenings on the return trip operate either retroactively or actually, because then within the intention of the parties, to give it the character of an interstate train.

Clearly the fact that, on orders subsequently received by it, rather than by an-

other train at Vasper, this particular engine, rather than some other engine, picked up the interstate car that it had there dropped, and hauled it to La Follette, can have no such effect; at the time of the accident, the trip from Vasper to La Follette, and the picking up of an interstate car as part of the consist on that trip were not within the contemplation or intention of the parties. There was no connection, direct or indirect, between the accident and this later interstate trip. Further, the fact that one of the seven switched cars was subsequently billed as an interstate car cannot tend to make the switching operation in any sense interstate; at the time of the switching operation the later billing was entirely within the control of the mining company. So far as the record shows, it is purely accidental that this car was later billed interstate instead of intrastate; moreover, it never became a part of the train haul of this particular engine.

It is, however, urged that the entire trip to and from Turley is one, at least as far as Vasper on the return; that to that extent it was made under one original order given at Coal Creek; that at the time of the accident the return with loaded cars was within the contemplation and intention of the parties under this order; that such loaded cars ordinarily on such trips included interstate cars; that in fact on this return trip, interstate cars were actually hauled. The record, however, fails to show that the interstate cars so hauled were billed as interstate cars at the time of the switching accident in the morning; on the contrary, it is testified that customarily the billing is done in the afternoon.

[2] More important, however, is another consideration: In our judgment, despite the fact that the journey to Turley and back to Vasper was made under one order, that order directed and contemplated two distinct trips for two definite and distinct purposes —the trip to Turley for the purpose of distributing empty coal cars, and the trip from Turley for the purpose of picking up loaded coal cars. The subsequent reports to the Interstate Commerce Commission confirm the distinctiveness of each of these trips. We confine ourselves, as is essential in this line of cases, to the facts presented by this record. We express no opinion on the situation that would arise if the trip to Turley had been made solely for the purpose of picking up loaded cars on the return trip.

In the recent cases of Pennsylvania R. R. Co. v. Morrison, 3 F.(2d) 986 (decided January 5, 1925), and Baltimore & Ohio R. R. Co. v. Darling, 3 F.(2d) 987 (decided February 4, 1925), we have held that a switch movement of intrastate cars, made for the very purpose of connecting with interstate cars and thereafter forming an interstate train, is a movement in interstate commerce; but in those cases the connection was direct and immediate. In the present case, while the accident on the going trip might have delayed or affected the interstate return trip, the connection between the two is not such as, in our judgment, would justify changing the character of what would otherwise clearly be an intrastate train and an accident governed by state law into an interstate train and an accident governed by federal law; Grigsby was not at the time of his death engaged either in interstate transportation or in work so closely related thereto as to be practically a part thereof. See Illinois Central R. R. Co. v. Peery, 242 U. S. 292, 37 S. Ct. 122, 61 L. Ed. 309.

Judgment affirmed.