**CHESAPEAKE & POTOMAC TELEPHONE CO. OF BALTIMORE CITY v. WEST et al.**

**No. 2240.**

District Court, D. Maryland.
May 11, 1934.

Charles McHenry Howard (of Venable, Baetjer & Howard), of Baltimore, Md., Raymond S. Williams (of Hershey, Donaldson & Williams), of Baltimore, Md., Ralph A. Van Orsdel and T. Baxter Milne, both of Washington, D. C., for plaintiff.

Richard F. Cleveland, Herman M. Moser, and John Henry Lewin, all of Baltimore, Md., for defendants.

Randolph Barton, Jr. (of Barton, Wilmer, Ambler & Barton), of Baltimore, Md., and Forrest Bramble, of Baltimore, Md., for Retail Merchants' Ass'n.

Before SOPER, Circuit Judge, and WILLIAM C. COLEMAN and CHESNUT, District Judges.

## Findings of Fact.

The above-entitled case having come on to be heard on the pleadings, on the application of the plaintiff for a preliminary injunction (and the parties having stipulated that on the evidence to be produced there should also be a final decree on the merits) and the parties having appeared by their respective counsel and offered evidence in support of their respective contentions; the Court having heard arguments and being advised in the premises now finds as the findings of fact:

1. The fair value of all the plaintiff's property, including working capital, cash capital, materials and supplies, considered as a going concern, as of December 31, 1933, is $39,541,921.27, of which 85% thereof, to wit, $33,610,632, is used and useful in the public service in its intrastate operations;

2. A fair allowance to the plaintiff company for working capital separately considered is $1,000,000 for its whole operation and $850,000 for its intrastate activities;

3. Going value has not been separately estimated but is included in the total $39,-541,921.27.

4. We find the reasonable and proper allowance for depreciation expense from the whole revenues of the plaintiff (both intra and interstate) will be $2,000,000 for 1934.

5. We find the probable net revenue of the Company for 1934 will be $2,742,005, resulting from all its activities interstate and intrastate, and 85% thereof, to wit, $2,330,-704, will result from intrastate activities alone.

6. We further find that the Maryland Public Service Commission has ordered a reduction in net revenues of the plaintiff derived from purely intrastate activities in the amount of $850,000 for 1934 and until further order. This deduction if made from plaintiff's net revenues applicable to its intrastate business alone will leave net revenue sufficient to produce a return on the fair value of the plaintiff's property at the rate of less than 4½%. We find that a return of less than 6% would be confiscatory under present conditions.

We refer to the opinion herewith filed for more detailed statement of facts and figures on which these ultimate findings are based.

## Conclusions of Law.

From the above findings of fact we conclude as a matter of law:

1. The order of the Public Service Commission of Maryland dated November 28, 1933, herein sought to be enjoined is invalid and null and void because it deprives the plaintiff of its property without due process of law, under the 14th Amendment to the Federal Constitution;

2. Said order is in legal effect confiscatory of the plaintiff's property.

3. The plaintiff is therefore entitled to an interlocutory and final injunction as prayed for in this case.

4. Plaintiff should recover its taxable costs herein.

CHESNUT, District Judge.

The Public Service Commission of Maryland by order dated November 28, 1933, required the Chesapeake & Potomac Telephone Company of Baltimore City (a Maryland corporation hereinafter called the company) to file new rate schedules effective on and after January 1, 1934, which would result "in a reduction of approximately $1,200,000 in the gross annual revenues of the said Company." It was stipulated that the effect on net revenues of the Telephone Company would be a reduction of $1,000,000.

The Commission *estimated* that the Company's net revenue for 1933 would be $3,-353,793, which would be sufficient to allow the Company a return of 6% on the fair value of its property of $32,621,190 as determined by the Commission. The Company's *computed* net revenue for 1933 was $2,527,-961; the difference lying principally in the amount of the depreciation expense allowance which the Company determined to be

$2,166,211; but which was estimated by the Commission at $1,352,284. On the basis of the Company's book accounts for 1933, the effect of the order was to require a reduction in net revenue of about 40%. On the Commission's estimate of net revenue the deduction required was about 30%. The Company's net revenues had already declined 23% from their peak in 1931, $3,287,265, to $2,527,961 in 1933, due to the general business depression. The combined effect of the economic condition and the Commission's order is to reduce the estimated net earnings for 1934 (as we find them) as compared with 1931, nearly 50%.

On December 13, 1933, the Telephone Company filed its bill in equity in this case to enjoin the enforcement of the Commission's order on the ground that the reduction required was violative of the constitutional guarantee of due process of law contained in the Fourteenth Amendment to the Federal Constitution, and the new rates so ordered would be confiscatory of the plaintiff's property. The bill alleged that under the reduced rates the Telephone Company would not be able to earn so much as 3% on the fair value of its property which it alleged had much greater value than that fixed by the Commission.

The bill prayed for a preliminary as well as a perpetual injunction. A restraining order was passed and became effective after the Telephone Company filed a bond with surety in the amount of $300,000 which provides for the refund to telephone subscribers of any rates paid by them in excess of the sums ultimately determined to be properly chargeable to them, if a preliminary injunction shall not be granted to the plaintiff. Thereafter a three-judge court was constituted in accordance with the requirement of United States Code, title 28, § 380 (28 USCA § 380), and the case assigned for trial at the earliest practicable date in view of prior engagements of court and counsel. The hearing has now been held on the pleadings and very full proofs and the case has been submitted by counsel for decision on the application for preliminary injunction and also for final decree on the merits. The question presented can be simply stated—Does the order in effect confiscate the plaintiff's property by allowing it less than a fair return upon the fair value of its property? The solution of the question necessitates a finding from the evidence of three controlling facts: (1) What is the fair value of the plaintiff's property used and useful in the public service, and (2) what is the fair rate of return on the value of the property so found, and (3) what net revenue will the plaintiff have under the reduced rates ordered by the Commission.

The governing principles of law for the determination of these two questions are thoroughly well settled by numerous recent decisions of the Supreme Court. The public is entitled to adequate service at reasonable rates. Correlatively the Telephone Company is entitled to a fair (nonconfiscatory) return upon the fair value of its property. The valuation must give due weight to present rather than past values, but the determination of present value is not an end in itself but rather to afford ground for a prediction of future values upon which to determine valid future rates. Los Angeles Gas & Electric Corp. v. R. R. Commission, 289 U. S. 287, 311, 53 S. Ct. 637, 77 L. Ed. 1180. It is also well settled that in arriving at a fair valuation due allowance must be made for existing depreciation; and in determining the rate of return the Company is entitled to a rate equivalent to that "on investments in other business undertakings which are attended by corresponding risks and uncertainties;" and "it should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties"; and also that "a rate of return may be reasonable at one time and become too high or too low by changes affecting opportunity for investments and changes in the money market generally." But the Company "has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. Furthermore it is clear that this court does not sit as a board of revision but only to enforce constitutional rights." The only question here is whether the rates fixed by the Commission are confiscatory. Upon that question the complainant has the burden of proof and the court should not "interfere with the exercise of the state's authority unless confiscation is clearly established." Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U. S. 679, 692, 693, 43 S. Ct. 675, 67 L. Ed. 1176; Los Angeles Gas Co. v. R. R. Comm., 289 U. S. 287, 304, 319, 53 S. Ct. 637, 644, 77 L. Ed. 1180; United Railways & Electric Co. v. West, 280 U. S. 234, 250, 50 S. Ct. 123, 74 L. Ed. 390.

We approach the consideration of this case in the light of these principles. The

primary question in this, as in all rate cases, is the determination of the fair value of the Company's property. This must be determined from the evidence. Before analyzing it a further consideration should be stated.

The Maryland Commission has jurisdiction over the intrastate property and revenues of the Company and not over its interstate business, the latter being subject to the jurisdiction of the Interstate Commerce Commission (Interstate Commerce Act § 1, as amended, 49 USC, § 1 [49 USCA § 1]). In the Commission's order, dated November 28, 1933, and its accompanying extended opinion, the property of the Telephone Company and its revenues both interstate and intrastate were treated jointly and not separately, but by stipulation of counsel and express agreement of the Public Service Commission of Maryland and a formal amendment of the original order, it is agreed that the property of the Company devoted to intrastate service is 85% of its whole property, and similarly that the net revenues applicable to intrastate operations are 85% of the whole net revenues of the plaintiff; and that the original order of the Commission was intended to effect a reduction of not less than $850,000 (instead of $1,000,000) in the net annual revenues of the plaintiff derived from intrastate business; and it was further agreed that the amended order shall be effective nunc pro tunc as of the date of the original order. Therefore, while it is recognized of course by all parties to the case, that its ultimate determination must depend upon a finding of the fair value of that portion only of the property which is devoted to the intrastate business and the revenues resulting therefrom, nevertheless it will be more convenient in the analysis of the evidence in the case to consider the whole property and the whole revenues of the Company, as that was the basis on which the figures were originally submitted to and discussed by the Commission, and likewise here. By reason of the stipulation the legal result will be the same whether the property and revenues be considered as a whole or the intrastate portion of the business be considered separately.

### The Fair Value of the Property—Three Standards Considered.

The evidence in this case affords three separate methods or standards of depreciated valuation for the property of the Company. As of December 31, 1932, they are (without working capital) as follows:

The Commission's valuation..$32,610,327.00
Company's valuation......... 46,351,119.00
Book or historical cost of Company's property........... 39,761,966.12

The nature of book or historical cost needs no elaborate explanation. Actual "original" cost may of course be different from recorded book cost in some cases, but there is no such distinction here, where original or book or historical cost all have the same meaning. It represents the actual amount charged to capital on the books of the Company for plant and fixed assets devoted to the public service (after deduction for retirements) during the whole history of the Company which covers a period of 50 years, although 90%, approximately, of the Company's property has been acquired since 1910. The Company's accounts have been kept in compliance with the regulations and orders of the Interstate Commerce Commission since 1913 and the Company itself has been subject to Commission regulation in Maryland since 1910.

The method used by the Commission in arriving at its valuation was to take the rate base as determined by a three-judge court in this district as of December 31, 1923 [C. & P. Tel. Co. v. Whitman (D. C.) 3 F.(2d) 938], together with the annual net additions to the property since that date as recorded on the books of the Company and to re-price or re-value, as of December 31, 1932, the said sums according to a so-called "index translator" of prices determined by the Commission to represent the fair value trend of prices for general commodities and construction work from 1923 to 1932. The method will be described in more detail hereafter.

The basis of valuation put forward by the Company is the familiar well-known "re-production cost new less depreciation" theory of valuation.

No single one of these three methods of valuation is an exclusive or final test. But the amounts arrived at by the respective methods are all relevant facts for consideration together with other relevant facts appearing in the evidence. The determination of fair value for rate making purposes is necessarily a judicial function which calls for "a reasonable judgment, having its basis in a proper consideration of all relevant facts." Minnesota Rate Cases, 230 U. S. 352, 434, 33 S. Ct. 729, 754, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Ga. Ry. & Power Co. v. R. R. Comm., 262 U. S. 625, 630, 43 S. Ct. 680, 67 L. Ed. 1144; Blue-

field Water Works & Improvement Co. v. Public Service Comm., 262 U. S. 679, 690, 43 S. Ct. 675, 67 L. Ed. 1176; Los Angeles Gas & Electric Co. v. R. R. Comm., 289 U. S. 287, 306, 53 S. Ct. 637, 77 L. Ed. 1180.

The Supreme Court has been careful, in view of its distinctive function in the enforcement of constitutional rights, not to adopt any single or definite artificial rule or formula for invariable application in all cases. The judicial determination of what constitutes fair value must be determined from the special facts and circumstances of each particular case giving such relative weight to the several theories or methods of valuation in any particular case which the circumstances thereof properly require. In the comparatively early case of Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819 (still a leading authority in the field of utility rate regulation), it was said (page 546 of 169 U. S., 18 S. Ct. 418, 434, 42 L. Ed. 819):

"And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

In later cases it has been appreciated that of the several matters for consideration here outlined relatively little weight can be given to the market value of the Company's securities and its earning capacity under existing rates because these considerations necessarily beg the question to be determined. It has resulted therefore that in most cases of such valuation there are available only the actual book or "historical" cost of the property and the estimated cost of its reconstruction new. And of these two considerations the one more frequently applied in modern rate cases has been the estimated cost of reproduction. The reason for this is that in most cases the book or historical cost data are either not complete or are unreliable or have been incurred under conditions dissimilar to those existing at the time of the rate inquiry. But where actual cost data are available and reliable and represent the actual expenditures for the public service under conditions reasonably approximating those prevailing at the time of the rate inquiry, cost has been given very great weight in determining present value. Thus, in several of the most recent cases in the Supreme Court, the valuation adopted or approved has been substantially book or historical cost rather than reproduction cost. Los Angeles Gas Co. v. R. R. Comm., 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; Clark's Ferry Bridge Co. v. Public Service Comm. of Pennsylvania, 54 S. Ct. 427, 78 L. Ed. 767 (decided February 5, 1934); Dayton P. & L. Co. v. Public Utilities of Ohio, 54 S. Ct. 647, 78 L. Ed. 1267 (S. Ct. April 30, 1934).

### Book or Historical Cost.

After consideration of all three valuations, and the testimony in the case with relation to them respectively, and all other relevant evidence bearing on valuation, we reach the conclusion that the fair value of the property of the Telephone Company used and useful in the public service, considering the Company as an efficiently managed and going concern with its attached business, without otherwise adding a specific sum for going value, but including an allowance of $1,000,000 for working capital, is $39,541,921.27, as of December 31, 1933. In reaching this conclusion we have given special weight, under the facts and circumstances of this particular case, to the historical cost of the property as it appears on the books of the Company diminished by the full amount carried in or credited to the depreciation reserve. The figures therefor as of December 31, 1933, are to be found in Plaintiff's Exhibit A 2, line 18, col. 3, as the aggregate book cost figure for total telephone plant (after deduction for retirements) $50,025,278.83, less depreciation reserves (line 42, col. 3) $11,483,357.56, to wit, $38,541,921.27, to which we add, for reasons hereinafter stated, the sum of $1,000,-000 as a reasonable allowance for working capital, thus making the total valuation as the rate base for further consideration and computation in this case in relation to the effect of the Commission's order, $39,541,921.-27. While historical cost has been given dominant weight in the valuation in this particular case, it is to be observed that no specific additional allowance has been made for the element of intangible value, called going value, and the full depreciation reserve (now

about $1,500,000 more than normal) has been deducted from the cost of the physical property. We will mention some of the special considerations which have led us to give dominant weight to historical cost.

The history of this particular company covers a period of 50 years. It began in 1884 with a telephone plant local to Baltimore City, and has gradually in subsequent years absorbed practically all other telephone companies both in Baltimore City and in the State of Maryland. The accuracy, fairness and completeness of the cost data as recorded in the books of the Company have not been challenged. Since 1910 it has been subject to Commission regulation in Maryland with requirements for full periodical reports, and since 1913 it has been obliged to comply with the requirements of the Interstate Commerce Commission in keeping its accounts. It has been not only under the constant current annual supervision of the Maryland Commission but it has frequently had rate hearings including several valuation proceedings before the Commission and one in 1925 before a three-judge court in this district. (See C. & P. Tel. Co. v. Whitman (D. C.) 3 F.(2d) 938.) It appears from an examination of the opinions of the Commission in these cases that at all times up to the present the Commission has found approximately that the fair value of the Company's tangible property for rate making purposes has been the same as the book costs and since 1916 there has always been allowed in addition for rate purposes an amount for intangible values of over $700,-000. Although the Commission has at times somewhat increased the value of the property of the Company over book costs, the latter have never been written up on the books, not even after a substantial increase made in 1925 as the result of the court valuation at that time. On December 30, 1911, the Maryland Commission filed an extended opinion with regard to the value of the property of the Company and its rate schedules, after hearing and consideration.[1] As of September 30, 1910, it found that the fair value of the telephone property less depreciation, $5,665,729.-74, was almost identically the same amount recorded on the books of the Company at cost. On this value the Commission allowed an 8% return and a depreciation allowance of about 6% on an average, and the rates were fixed accordingly.

In 1914 in consequence of a petition by organized telephone subscribers (the Telephone Protective Association of Baltimore City), the Commission again held an elaborate rate hearing and on March 18, 1916, it filed an extended opinion of more than 100 printed pages reviewing the valuation and rates of the Company. In this case a physical valuation was made by engineers for the Commission as well as computation of cost of reproduction by engineers for the Company. The value then found for the physical property was substantially the same as the estimated original cost and only slightly less than the book value. After deducting existing depreciation found to be 20%, and then adding $705,000 for intangible values and an allowance of $500,000 for working capital, the final rate base was fixed at $11,554,758.[2]

---

[1] In that opinion (Md. P. S. C. R., vol. II, 375) the Commission said:

"As the first step in the investigation, the Telephone Company was required to furnish a detailed list of all its property, with an itemized statement of the values, and to insure that this should be full and complete, our Chief Engineer prepared a set of interrogatories to elicit the desired information. The answers to these interrogatories were referred to our Chief Auditor for verification by comparison with the Company's books and accounts. After a close and careful investigation the Chief Auditor reported the accounts thoroughly systematized and accurate, and that while there had probably been some over-valuation of the properties existing at the time of consolidation in 1883, this had been to a large extent corrected by the liberal deductions since made for depreciation, and that he found nowhere any suggestion of value claimed for intangible property. Our Chief Engineer's investigation extended over a period of about five months, during which time his work with his entire staff was unremitting. On March 17, 1911, with other conclusions, he reported that after going over all the inventories and checking every item, he found the 'book' values stated by the Company so reasonable and moderate that, in his judgment, nothing could be gained by a 'physical valuation.'"

It was then noted that the Chief Engineer's opinion had been confirmed in substance by a telephone company engineer of international reputation independently engaged by the Commission.

[2] In that case (Md. P. S. C. R., vol. VII, 143, near the end of the opinion—also Defendant's Exhibit 15, p. 96) it was said:

"It will thus be seen that while our final figure of $11,554,758 was ostensibly the outcome of an effort to value the property upon the basis of reproduction cost, it in reality becomes in the end fairly repre-

During the World War the telephone property was taken over by the Government for operation and the rates were raised. When the property was restored to private ownership, the Commission, on the petition of the Protective Telephone Association of Baltimore City, held another rate hearing and thereafter filed another. extended opinion under date of August 18, 1920.[3] From the Commission's opinion (Defendant's Exhibit D 16, page 9) it appears that the book value of the telephone property as of December 31, 1919, was $18,523,885. In determining the fair value as of that date the Commission adopted as total cost new a slightly larger figure, $19,272,057, the difference between the net increase in book value and in reproduction cost new increase being due to the fact that since 1914 plant retirements had been credited to book values at the average book cost but were valued for the purpose of bringing up to date previous reproduction figures at the average price used by the Commission in the previous case. The Commission again deducted depreciation at the rate of 20% and again added $705,000 for intangible values and allowed $750,000 for working capital, thus making the fair value, as of December 31, 1919, depreciated $16,725,532. Rates were fixed which were calculated to allow the Company a return of 5.30% on an estimated average fair value in 1920 of $17,250,000.

In 1924 the Company asked for an increase in rates which, after a contested hearing, was refused by the Commission in an extended opinion filed December 29, 1924.[4] The Company contended in justification for its requested increase in rates, that the value of its property had greatly increased over the amounts previously allowed as fair value by the Commission and claimed on the basis of an appraisal made by its experts, that the depreciated value of its property by one appraisal was $41,541,110 and by another $37,115,153, as of December 31, 1923. The Company's book cost of that date after deducting depreciation reserve was $21,563,683. The Commission rejected the Company's appraisals and adhered to the valuations on the principles laid down in the former cases which was slightly more than book cost, increased by an allowance for working capital and intangible values, less depreciation reserve, thus arriving at a fair value of $24,350,944. Working capital was increased from $750,000 to $975,000. In the opinion it was said:

"The Commission is convinced that the rate base established in case No. 690 (in 1914) was generous to the Company and was to be regarded as final, and that changes in it were to be made on the basis of net additions. The Commission therefore feels in duty bound to adhere to it."

It found that the return to the Company at the then prevailing rates would be 5.96%.

---

sentative of its estimated original cost as well.

"We have seen that if the earnings for the year ending June 30, 1914, were capitalized at 6 per cent., they would indicate an earning capacity of $11,220,664.

"Tabulated, these figures stand as follows:

| | |
|---|---|
| Original Cost | $11,554,758 |
| Reproduction Cost | 11,554,758 |
| Book Value | 12,072,036 |
| Earning Capacity | 11,220,664 |
| Capitalization | 9,760,000 |

"In view of the approximate unanimity of results reached by each of these five methods of ascertaining value, it would seem clear that the fair value of the respondent company's property in this State is in or about $11,500,000, and inasmuch as this figure so closely approximates the depreciated original and reproduction cost values of the company's property as of June 30, 1914, we have accepted such value of $11,554,758 as the fair value of the property on that date for rate-making purposes."

[3] See Md. P. S. C. R., vol. XI, 197. The preceding case in 1916 was referred to in

the following way, the personnel of the Commission having in the meantime changed:

"Osborne I. Yellott, Esq., had, in the meantime, been appointed Assistant General Counsel, and the inquiry was planned and executed under the guidance of this most competent, industrious and efficient expert in the domain of public utility regulation. The investigation of the Company's property, business, books and affairs was systematic, thorough and exhaustive. Mr. Yellott had the assistance of Messrs. Marbury and French, who made a deep study of the problems presented, and of the Commission's engineers and auditors, and also of the services of the best telephone engineering and accountancy experts that could be procured. The work in this case is epochal in the development of utility regulation by State Commissions and is universally conceded to be a monumental undertaking, masterfully executed according to the most modern and approved methods of engineering and accounting rules for the determination of rate-making values."

[4] Md. P. S. C. R., vol. XV, 241, 273.

The Commission was apparently greatly impressed with the consideration that the local Telephone Company was in practical effect a branch or department only of the national American Telephone & Telegraph Company and that the contract between the two companies whereby the local company paid the A. T. & T. Company 4½% of revenues was too favorable to the parent company and that in fairness to the Maryland telephone subscribers the revenues of both companies from their operations in the state, should be blended and pooled in the determination of what was a fair return. (This payment has now been reduced to 1½ and is not in issue.)

The Company appealed to this court for injunctive relief which, after hearing by a three-judge court, resulted in the issuance of an injunction with opinion holding in substance that the fair rate base for December 31, 1923, was $29,507,949 (after deducting depreciation but including working capital and going value), and that the Company was entitled to a return of not less than 6% thereon. The effect was to increase the Commission's valuation by over $5,000,000 and to increase valuation over book cost almost $5,750,000. Neither party appealed from the decision and on remand of the case to the Commission, the latter redetermined the value as of December 31, 1924, at $33,399,530 by adding to the value as determined by the court subsequent additions with adjustment for decrease in depreciation reserve, on which new rates were based to yield 6% return. The rates so fixed remained unchanged by the Commission until the latter instituted the present rate case of its own motion on January 19, 1933, which resulted in the order for a reduction of rates, the validity of which is involved in this proceeding.

From this review of the history of the relations of the Company and the Commission, it appears that the book cost of the property with relatively small additions for intangible values and working capital, has been substantially the constant basis of valuation for rate making since 1912 with the exception of the period beginning in 1925 when the valuation was raised as a result of the court proceedings. This increase in valuation as appears from the opinion in the case [(D. C.) 3 F.(2d) 938] resulted from the conviction that materially higher price levels over those prevailing at the time of the original physical valuation of the Company's property in 1914 had been reached and seemed to be permanent, and the decision was evidently made in deference to the effect of binding decisions that valuation of the Company's property was required to be on the basis of present values. Since then it is undoubtedly true, as has been noted in recent cases in the Supreme Court, that there has been a very general decline in values with corresponding increase of the purchasing power of the dollar, and early in 1933 when the pending rate case was begun by the Commission this change in the general level of prices seemed again comparatively permanent in its nature; so that it is not surprising to find the Commission in its opinion in this case saying (page 2):

"The proceeding grew out of a conviction on the part of the Commission that, in view of the general decline in values of all property, the public was entitled to a reduction in the rates charged by utilities generally and that such reductions should be based on the value of utility properties at present day prices. Acting on this conviction, the Commission, when it became convinced that the lower level of prices was not merely temporary, but that, to use the words of Chief Justice Hughes of the United States Supreme Court in the opinion in the Los Angeles Case, we were 'upon a changed economic level,' began discussions with utility managers throughout the State looking to a lowering of their charges."

It appears further in the opinion that voluntary reductions in rates were made by many public utilities in the State but that the Telephone Company declined to make any reduction, possibly because it had already sustained a substantial reduction in its revenues in the loss of many telephone subscribers. It was natural and reasonable for the Commission to feel that, as the Company had a substantial increase in its rates as the result of the Court's increase in the valuation of the Company's property in 1925 by reason of generally increased values, there should be a corresponding decrease of rates and if necessary a new reduced valuation of the Company's property when again there seemed to be a new and much lower economic level. The Commission, however, in its new valuation, not only eliminated the increase in value which had been made in 1925 but went very much further, and in the new valuation fixed it approximately $7,000,000 below book cost less depreciation reserve; and in doing so the Commission did not return to the principles of valuation which it had announced in successive cases prior to the court proceeding and which, as stated by it in the 1924 case, were to be regarded as final. In the present case no doubt the Commission felt that in

view of the Company's repudiation of the prior basis of valuation the Commission was itself under no obligation to adhere thereto. The position is logical, but the question still remains as to whether the valuation so now fixed by the Commission is not so unreasonably low as to amount to confiscation. If the book values under all the circumstances of this case are nearly a fair measure of present value (both physical and intangible), the valuation found by the Commission is undoubtedly confiscatory.

The valuation which we conclude to be reasonable is supported and measurably confirmed by other important evidence in the case. It is approximately the amount of actual cash investment made to produce the property. In the Company's balance sheet (Exhibit A 2, lines 32, etc., col. 3) we find that the amounts invested in the capital stock and funded liabilities and surplus of the Company amount to $39,214,980. Of this amount $3,000,000 of preferred stock has been issued at par plus a premium of $15,419 and $30,000,000 of common stock has also been apparently subscribed and paid for at par (for the most part definitely shown to have been paid in cash or by the exchange of stock for cash previously loaned) much the greater part of which has been advanced since the Company has been under Commission regulation. · There is no convincing proof that any of this money has been unwisely or imprudently invested.[5]

### Cost of Reproduction.

Another relevant fact for consideration as to value is the Company's estimated cost of reproduction new of the property less depreciation. In the very carefully considered 1916 case the Commission itself used this method of valuation and found the results substantially accorded with the book costs. In subsequent cases, up to the present, the Commission has adhered in substance to book costs as the basis for valuation. We do not consider the cost of reproduction so reliable for valuation of a public utility as book costs (when the latter are accurate and complete and have been built up under conditions not greatly dissimilar to those prevailing at the time of the rate case, and likely to prevail in the near future) because it necessarily proceeds upon hypotheses as contrasted with ac-

tualities, and is so greatly dependent upon estimates only, supported largely ·by merely expert opinion, and involves many highly speculative features. Nevertheless, as indicated in many authoritative judicial decisions, it is a relevant fact and entitled to fair consideration. We have so considered it here. While we cannot accept its final ·figures for the ultimate valuation, yet on analysis we do find, in certain of its important elements, substantial confirmation of the valuation that we have concluded is fair and just both to the Company and the public.

The estimate of cost of reproduction as submitted by the Company is summarized in Plaintiff's Exhibit A 32 where the depreciated value as of December 31, 1933, is estimated to be $48,422,816. And the component figures are supported by numerous exhibits and the oral testimony of witnesses in great detail. The plan of this method of valuation is to value directly the principal elements of the Company's property by estimating first the "directly distributed costs" thereof at present prices for labor and material and to add thereto, for necessary incidental further costs of construction, percentages sometimes called "overheads" but here called "undistributed construction costs." To the aggregate so produced there is further added the costs of certain land not previously included, and all rights of way and other generally necessary equipment and also substantial allowances for working capital and intangible values called "going value"; to none of which are the so-called overheads applied. The elements of property contained in the appraisal under the heading of "directly distributed costs" include the important items of land and buildings. In this case the value of the land is covered by stipulation of counsel and is therefore not in dispute; and the depreciated value of the buildings is given in the uncontradicted testimony of two very competent local builders. · The remainder of this class of property consists of what is peculiarly telephone apparatus and equipment, such as central office and private branch exchange and other station equipment, pole lines and wires and aerial and underground and submarine cables. The whole of this peculiar telephone property was not directly appraised but representative portions or samples thereof were directly inventoried and

---

[5] It does appear from the Commission's opinion in the 1924 case (page 21) that the competing Maryland Telephone Company in Baltimore City acquired in 1908 entailed a loss of approximately $3,450,- 000, all of which, however, was absorbed by the American Telephone & Telegraph Company and the New York Telephone Company and not charged to the C. & P. Telephone Company.

valued at prices currently paid for labor and materials. Some of it was valued by translating original cost into 1933 values, by an index translator of actual telephone property costs for materials and estimated wages.

If we omit for the moment the allowance made for working capital and going value, and the particular amount deducted for depreciation, we find no substantial objection to the general plan of valuation adopted for the other items in the appraisal, although in so doing we are not to be understood as adopting for valuation the particular figures in the appraisal. The general plan that has been followed is, we understand, consistent with the theory of this method of valuation. Counsel for the Commission emphasizes specifically two objections to the appraisal other than for the items of working capital and going value. These objections are (1) that the prices used for the present cost of labor and materials are too high, the latter being based on the prices currently charged by the Western Electric Company, a subsidiary of the American Telephone & Telegraph Company, the owner of all common stock of the local Telephone Company, and (2) that the percentages allowed for "undistributed construc-

tion costs" are excessive. As to Western Electric prices (of which more will be said hereafter) it is sufficient here to say that if the criticism is accepted as valid, the result, under the uncontradicted testimony, would be to reduce the aggregate of the appraisal by only $1,500,000. As to the labor cost, we do not find the criticism valid. Although the price level of wages generally has declined in recent years, this is not equally true with regard to public service wage rates in Baltimore City. The uncontradicted evidence is that the Telephone Company's wage rate has been rising rather than falling. This is explained on the ground that in some respects the Company's wage rate had been unduly low in past years and certain adjustments in recent years have been made with the effect of a general increase in the average rate paid.[5a] The evidence is not susceptible of a definite determination in dollars as to the relative influence of the wage rate and trend of prices for telephone apparatus as affecting ultimate cost in recent years.[5b] With regard to the percentages allowed for "undistributed construction costs" it will be observed from the Exhibit referred to that the total allowance amounts to $7,494,998 on a base of $39,536,-

[5a] There would seem to be no just criticism from the standpoint of public policy in maintaining the wage rate of public utilities even at a time of generally declining prices, where it is reasonably possible to maintain them. Certainly it has been the announced policy of the general government that wages should be maintained so far as possible despite the depression.

It is common knowledge in Baltimore, and especially within the knowledge of one of the Judges of this Court (where the United Railways Company of Baltimore is in receivership) that there has been no reduction in recent years in the wage rate of the employees of the United Railways although there have been other economies in operation and probably a substantial reduction in the number of employees owing to these economies and lessened traffic.

It should also be noted that the wage rate paid by the Telephone Company in the last ten years has been generally lower than the average Baltimore wage rate as determined by the Commission. On the basis of valuation by book or historical cost the public has obtained the advantage of this in the construction costs charged to capital on the books of the Company. (See Plaintiff's Exhibit A 46.)

[5b] Defendant's Exhibit D 5, page 51, indicates that the weighted average of the value of labor and materials in fixed capital additions to the telephone property

from 1924 to 1932, inclusive, was 64.99% for material and 35.01% for labor. But how far in dollars the rise in the Telephone Company's wage scale is off-set or over-balanced by decreased prices for material is not readily determinable from the evidence. In the valuation based on book costs, the public has gotten the benefit of the actual current wage rate in the past paid by the Company to the extent that it has been lower than the general labor wage rate paid in Baltimore. In the cost of reproduction the assumed wage rate is the Company's present current wage rate (now somewhat higher than in the past) but adjusted downward for wholesale or large construction work, according to the testimony of the Company's chief engineer, Speer. The rate so assumed is of course the personal estimate of the witness and it is criticized as too high by the Commission's witness, Smith. Neither the estimate nor the criticism thereof is supported by sufficiently detailed data to enable the court to determine with certainty which is correct. The witness Speer seemed to be a very competent engineer and credible witness but his assumption of a particular wage rate was necessarily an estimate only, for a hypothetical case. This illustrates the view that the cost of reproduction is inherently a method of valuation less satisfactory than historical cost in this case.

404, not quite 19%. Without specifically approving these particular percentages, or the several items thereof, we observe that as a whole they are not excessive when compared with allowances of the same nature which have been made in other cases where reliance has been placed upon this method of valuation.[6]

We have made the following comparison between valuations by book cost and by estimate of cost of reproduction in this case. The figure for book costs new is $50,025,278, which, of course, does not include any specific sum for going value. The comparable figure in the estimate of cost of reproduction, deducting the $4,500,000 allowed for going value, and $1,615,000 for working capital is $49,031,267. Both of these figures are undepreciated. To compare fair value as we have determined it with cost of reproduction necessitates some adjustments in the latter. Our valuation proceeds on the basis of taking the total book cost of the property new and deducting the full depreciation reserve and adding thereto $1,000,000 for working capital ($615,000 less than allowed in cost of reproduction new), and without specific additional allowance for going value. To adjust the estimate of cost of reproduction to a comparable basis we must make certain deductions therefrom; (1) the reproduction appraisal deducts for depreciation only $6,723,451; the comparable item deducted by us is $11,483,-357—a difference of $4,759,906; (2) the appraisal allows $1,615,000 for working capital; our allowance is $1,000,000—a difference of $615,000; (3) for the comparison only there may also be deducted from the reproduction appraisal the amount of $1,500,-000 which counsel for the Commission contends is an excessive amount allowed for cost of material. The sum of these three deductions is $6,874,906, which must be subtracted from the estimated cost of reproduction new, less depreciation, $48,422,816, thus reaching $41,547,910 as the figure given by the estimated reproduction cost (including going value, at $4,500,000) as comparable with our valuation of $39,541,921 (which includes going value although not specifically appraised therein). The difference between these two figures, to wit, $2,005,989, represents what we consider at least an excessive allowance for going value in the cost of reproduction.

Therefore, comparing the two methods of valuation, book cost and cost of reproduction new, as they appear in the evidence in this case (with the adjustments that we have indicated with regard to the latter, which make it fairly comparable to the former), the fair inference is that each tends to confirm the other and to indicate that the present value of the property, whether considered from the standpoint of actual historical cost or based on cost of reproduction new at present prices, and giving adequate consideration to intangible values, is approximately the same, and is between $39,000,000 and $40,000,000. But even if it could fairly be said that the adjustments we have made in the Company's estimate of cost of reproduction new are too drastic, we nevertheless adhere to our view above expressed that dominant weight should be given in this case to actual historical cost in preference to other methods of valuation. As was said in the Los Angeles Gas & Electric Company Case, page 308 of 289 U. S., 53 S. Ct. 637, 645, 77 L. Ed. 1180:

"The weight to be given to actual cost, to historical cost, and to cost of reproduction new, is to be determined in the light of the facts of the particular case. McCardle v. Indianapolis Water Co., supra [272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316]."

Nor do we think the valuation so arrived at can be justly regarded as unfairly high to the public. As we have pointed out it is almost exactly equivalent to the actual dollars invested in the property. It eliminates the additional value of $5,750,000 allowed by the court in 1925 over and above book costs.

### Going Value.

It also eliminates any specific allowance for going value which was fixed by the Commission in the 1916 case at $705,000 after full consideration. The theory of an allowance for going value is that the property as a going concern with attached business of many thousands of telephone subscribers and with a large and substantial income therefrom is

---

[6] In the Commission case in 1916 the subject was very fully considered and it was determined that percentage allowances of this character were real and not imaginary elements of cost and the amounts allowed in that case both in the aggregate and in detail for comparable items were as nearly as large (17.67) as here. In Los Angeles Gas & Elec. Co. v. R. R. Comm., 289 U. S. 287, 310, 53 S. Ct. 637, 77 L. Ed. 1180, it is noted that the estimate of reproduction submitted by the Commission's Engineer included "overheads" figured at 22.32%. See, also, Ohio Utilities Co. v. Comm., 267 U. S. 359, 360, 45 S. Ct. 259, 69 L. Ed. 656; New York Tel. v. Prendergast (D. C.) 36 F.(2d) 54, 64.

obviously of substantially greater value than that inhering in the mere physical structures constituting the telephone plant. It is difficult to prescribe a formula for the admeasurement of this intangible element of value. But that it is intrinsically an item for important consideration in rate making is generally recognized in all rate cases. In not making a specific allowance for going value in this case we wish to make it plain that we have not failed to consider it as an important element in the valuation. But as admitted by counsel for the Company a specific additional allowance for going value has much less support in reasoning and authority when the valuation is based on historical cost than when based on cost of reproduction new. And intrinsically considered on the merits it must be realized whatever intangible element of value inheres in the property and business by virtue of its efficient management and integration as a going concern, accumulates not as a separate and independent element of value but gradually from time to time coincident with the growth and management of the business and is in substance an incident to the development of the business contemporaneously paid for in the expense of operation and maintenance taken out of the rates paid by the public.

All relevant facts considered, we are of the opinion that a fair allowance for going value is made when we value the telephone property as a whole and as a going concern at its actual book costs less full depreciation. Dayton Power & Light Co. v. Public Utilities Comm. of Ohio, 54 S. Ct. 647, 656, 78 L. Ed. 1267 (U. S. S. Ct. April 30, 1934).[7]

It is also relevant to the case to point out that, as fair valuation in this case is the same as book cost less depreciation reserve, further rate litigation, so expensive primarily to the Company and ultimately to the public may, it is hoped, be avoided and subsequent changes in the rates when necessary in fairness either to the Company or to the public can, it is hoped, be met by action of the Commission in reducing or increasing the rate of return. The re-establishment of book value less depreciation as the rate base will also enable the Commission to return to the principle of valuation which obtained prior to 1925 and was then regarded by the Commission as fixed and final. And it has the added advantage of enabling the accounting for depreciation annuities or annual expense to be hereafter as well as heretofore on the base of cost as required by the uniform system of accounting of the Interstate Commerce Commission for telephone companies.[8]

### Deduction of Depreciation.

As already indicated, we have reached our conclusion as to valuation by deducting from historical book cost new the whole

---

[7] In this case, the last expression of the Supreme Court upon the subject, in a case where the Ohio Commission had not made any specific additional allowance for going value, the court said:

"The decisions of this court show what going value means (Los Angeles Gas & Electric Corporation v. Railroad Commission of California, supra, page 313 of 289 U. S., 53 S. Ct. 637 [77 L. Ed. 1180]), distinguish it from good will, and hold that upon proof of its existence it may have a place in the base upon which rates are to be computed. The commission was of opinion that there was here no constituent of property that called for separate appraisal apart from the recognition that had been given it as a contributory factor in other elements of value.

"The appellant is a new company, engaged in business for a few years. The value of its physical assets is less than a million dollars. In the brief term of its existence it professes to have added to that value from $125,000 to $140,000 by combining the parts into an organism and causing them to work together. The commission took the view that whatever increment of value had emerged from these sources was sufficiently reflected in the allowance of the cost of developing 'new business' and in the appraisal of the physical assets as parts of an assembled whole. A like conclusion has been reached by this court in very similar conditions. Los Angeles Gas & Electric Corporation v. Railroad Commission of California, supra, page 314 of 289 U. S., 53 S. Ct. 637 [77 L. Ed. 1180]. Going value is not something to be read into every balance sheet as a perfunctory addition."

[8] And thus avoid the conflict in accounting practice for interstate and intrastate business respectively. See Commission's opinion, page 52, where the Commission after pointing out that it would require the annual depreciation expense to be calculated on value (lower than cost) said: "And if as a result of this the Company finds itself in trouble with the Interstate Commerce Commission, it will have to adjust such trouble as best it may." See Commission's opinion, pp. 50, 52; and Plaintiff's Exhibits A 7, p. 67, and A 8, p. 20. See, also, United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390.

amount carried as depreciation reserve which, as of December 31, 1933, amounts to $11,-483,357.56 and represents approximately 23% of the cost new of total fixed capital (Plaintiff's Exhibit A 2). In so doing we have not overlooked the Company's contention that only existing and accrued depreciation may properly be deducted from value new. See McCardle v. Indianapolis Water Co., 272 U. S. 400, 416, 47 S. Ct. 144, 71 L. Ed. 316.

And it is further contended by the Company that the amount of the depreciation reserve does not necessarily, and under proper straight line depreciation accounting will not, accurately measure existing accrued depreciation, but should always exceed it. It has been held that a surplus accumulation in the depreciation reserve over and above that reasonably necessary may not constitutionally be applied by Commission order to supplement a deficiency in future net earnings under prescribed rates (Board of Public Utility Com'rs v. N. Y. Tel. Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808) ; and it has also been recently judicially "recognized that accrued depreciation, as it may be observed and estimated at a given time, and an appropriate allowance of depreciation according to good accounting practice, need not be the same" (Clark's Ferry Bridge Co. v. Public Service Comm. of Penna., 291 U. S. 227, 54 S. Ct. 427, 431, 78 L. Ed. 767, Supreme Court, February 5, 1934). There is, however, force in the contention that in the case of an old company, as here, where, over a long period of years in the past, the ratio of the depreciation reserve to the cost new of the whole plant has remained relatively stable, after deductions for retirements of plant (as is true for ten years or more in the case of this Company), it is fair to infer that the amount of the depreciation reserve does approximately measure the existing accrued depreciation. This view has been approved by the Interstate Commerce Commission in telephone property accounting and has been in substance judicially applied. Depreciation Charges of Telephone Companies, 177 I. C. C. 397; N. Y. Tel. Co. v. Prendergast (D. C.) 36 F.(2d) 54, 65. See, also, Railroad Comm. v. Cumberland T. & T. Co., 212 U. S. 414, 424, 29 S. Ct. 357, 53 L. Ed. 577; C. & P. Tel. Co. v. Whitman (D. C.) 3 F.(2d) 938; Idaho Power Co. v. Thompson (D. C.) 19 F.(2d) 547, 566. Viewing the matter simply as a question of fact, to be determined from the evidence, it is clear that the burden of proof is on the plaintiff to establish to our satisfaction that the amount of the existing depreciation is actually less than the reserve therefor. N. Y. Tel. Co. v. Prendergast, supra. The only testimony so offered by the Company is that of the witness Sloan, and we are not satisfied that his estimate of accrued depreciation makes sufficient allowance for all the elements constituting real existing depreciation. On the contrary the history of the depreciation reserve of this Company furnishes much affirmative proof that the book reserve measures approximately the existing depreciation in the plant. The subject was elaborately considered by the Commission in the 1916 case, which then found the value new to be $13,062,197, and the existing depreciation amounted to $2,612,439, just 20%. At that time the depreciation reserve was only $1,367,700, about 10%. But the Commission, pursuant to what it deemed good policy, continued the Company's rates which were estimated to yield not more than an 8% return and sufficiently more to build up the reserve to 20%, and thereafter to keep it uniform at that amount.[9] Again in 1920 the Commission considered evidence that the

---

[9] In that case the Commission said (see Defendant's Exhibit D 15, page 44) :

"Our conclusion is that the public should be required to create depreciation reserves not normally exceeding 20% of the plant investment as the same appears from time to time. After this reserve has been created and the property in its entirety comes to be valued it will be found that four-fifths of the same belongs to the stockholders and that one-fifth has been contributed by the public. This advance will have been made by the public as its guarantee that so far as it is concerned the Company will at all times be in a position to make replacements of its property when and as they are required for efficient service. And the reserve of 20% being created and invested in additions to the plant, the Company would be entitled to earn upon 80% of the total investment."

And on page 54 the Commission further said:

"We hold that the present depreciated value of the Company's property upon the basis of reproduction cost new is 80% of this amount, $10,449,758. The Company will be held entitled to earn upon this amount, plus such additions as we may make thereto for non-physical values and working capital. * * * Meanwhile the Company will further be held entitled to set aside out of earnings from year to year a sum to be added to its present depreciation reserve until such time as such reserves amount normally to a maximum average of 20% of the plant investment."

228

structural value of the property was approximately 70% of its cost new, but that the depreciation reserve was only 16.88%. Nevertheless it adhered to its policy of deducting for depreciation only 20% and allowed the Company to continue to build up the reserve to 20%. In subsequent years the Company has added to the depreciation reserves out of gross revenues until for the past ten years or more the reserves have averaged or approximated 20% of the fixed plant. For 1933 the percentage was about 23%.

Again in 1924, the Commission in determining the valuation adhered to its uniform principle of deducting 20% of cost new for depreciation. In the ensuing court case [(D. C.) 3 F.(2d) 951] the valuation adopted was diminished by the full depreciation reserve adjusted consistently with the cost new to the then price level as determined by the Court. The Commission has similarly treated this item in this case with adjustment of price level as determined by it.

In view of this history we think it only fair to the public and not unfair to the Company to take the whole depreciation reserve from the book cost new. We do not mean to imply that the public owns any part of the reserve, or that the Company is not entitled to earn on the whole (which has been invested in the plant and not kept intact in a separate fund) fair value of its property, but viewing the whole evidence, the fair value of the plant is the book value less the reserve. We are not unmindful that at the present time the depreciation reserve is slightly higher than normal and to the extent that it is, it is unfavorable to the Company in the final result as compared with the practice in the earlier Commission cases of deducting a flat 20% irrespective of the actual reserve which was expected, however, on the average to be just 20%. But this disadvantage to the Company is, we think, off-set by allowing it the full of its actual costs despite the generally lower trend of prices.

The Commission's Method of Valuation.

We come now to a more detailed consideration of the method of valuation adopted by the Commission. As already indicated we have approached the problem in the light of the presumptive correctness of the Commission's valuation which we would not be warranted in disturbing unless clearly erroneous. Perhaps it would have been more logical to direct our consideration in this opinion first to the valuation made by the Commission. But we have postponed the discussion until now in order that it could be better understood in the light of the historical matter above presented.

What the Commission did was this. It approached the rate hearing under the conviction that the Telephone Company's rates must be reduced in view of the general changed economic level of prices. In its investigation it made no new physical inventory or appraisal of the Company's property and produced no testimony either in the hearing before the Commission or here as to valuation except to depreciate book costs (as enhanced by the court's finding of value in the 1925 case) by applying to the valuation as found by the court in 1925 and the net additions to the plant in subsequent years, a so-called "index translator" of values to reduce values as established in 1925, with subsequent annual additions, to values as of December 31, 1932, in accordance with an index of prices determined by the Commission to represent the "fair value trend." In other words, the Commission valued the Company's property on the basis of the ratio that values in 1925 and subsequent years respectively bore to values in 1932 as determined by this so-called fair value trend. This method of valuation was adopted by the Commission in order to save the time and expense that would be involved in a physical appraisal. Nevertheless the Company did submit in the hearing before the Commission full data in support of its valuation based on reproduction cost new less depreciation. The Commission, however, disregarded this in its conclusion. The Commission's method in obtaining the so-called index translator to establish the relationship between values in 1925 and succeeding years with those of 1932 is fully explained in its opinion and is graphically illustrated by a chart appearing opposite printed page 29. The Commission developed an index for values which it called a "fair value" trend. This it evolved as a composite of several separate price trend curves which are referred to in the opinion and included in tables appearing at pages 24 to 28, inclusive. The Commission described its method in a note on page 26 as follows:

"These 'Fair Value' Translators are based upon December 31, 1932, as 100, and are intended to be, respectively, the percentages which, when applied to the value of the dollar at December 31, 1923, and to the average value for each of the years 1924 to 1931, inclusive, will produce value as of December 31, 1932."

The Commission developed its own curve or trend by taking a "weighted average" of 16 separate indices for prices of certain com-

modities and construction costs. Taking the whole value of all the price trends considered as indicated by the number 31, it assigned (on.what exact basis does not clearly appear) a value to each of the several price trends. Thus to the United States Department of Labor "all commodities" trend it assigned a value of 4; to the National Association of Purchasing Agents (commodity) trend, a value of 2, etc. As a result it deduced a price curve or ratio of price which was not greatly different from the so-called "all commodities" average put out by the United States Department of Labor. The latter is understood to represent the average price trend from 1923 to 1932, inclusive, of 784 commodities as raw materials. These 784 items are themselves subdivided into a number of different subclasses. The items in the subclasses vary greatly as to their respective price trends.[10] And the values which would be produced by the several price trends considered by the Commission also vary widely. By comparison we note that the value produced by the "fair value trend" of the Commission as of December 31, 1932, for the Company's property (after deducting depreciation) was $32,-610,327, but as of December 31, 1933, the application of the all-commodities price trend (which for December 31, 1932, was at a lower level than the Commission's fair value trend) produced $34,332,453.56; while the price trend of the Engineering News Record (given a weighted value of 2 by the Commission) produced $41,036,789.48 (see Defendant's Exhibit D 5, page 71). It is apparent that the Commission in a general way was seeking to value the telephone property on the basis of an *average* trend of cost of materials, labor and construction, but instead of taking an absolute average trend of all costs it took a so-called weighted average of only certain costs. The difference is, however, in our opinion not of fundamental importance. In either case there is the essential fallacy of *assuming* that an *average trend of all prices,* whether absolute or weighted, is a true index for the trend of construction costs of the special kind of property with which we are here dealing. Whether the valuation of telephone property is based on historical cost or repro-

duction new, it is, we think, obvious that the price change over a period of years can only fairly be reflected by developing a price ratio or trend for the costs entering into this particular kind of property. It is quite erroneous to assume that *changes in the price level* of *certain* commodities or the *average* of any number of commodities is similar to that of a *particular* commodity or property. This fact is amply demonstrated in the tables to be found in the Commission's opinion and in many of the exhibits filed by its counsel in this case. The fallacy of the Commission's method is also thoroughly and convincingly demonstrated in the oral testimony of the plaintiff's witnesses Barker, a valuation expert for the Vermont Commission, and a Dr. King, an experienced economist and statistician. To some extent the Company's estimate of cost of reproduction new is based on the use of price trends but the trend or curve so developed is based definitely on telephone plant construction prices. If this valuation method is to be used at all, we think it entirely clear that the only proper use is that adopted by the Company and not that used by the Commission; provided, of course, the cost data used by the Company represented fair and reasonable prices for telephone apparatus and construction work. It is the contention of the Commission that the costs so used in its estimate of reproduction by the Company are not fair and reasonable. They were admittedly based for the purchase of materials on prices of the Western Electric Company from which the Company purchased all its telephone apparatus and equipment and on the wage scale paid locally by the Company, with some adjustment for wholesale construction work. We will consider this objection more fully hereafter.

While in the exercise of our limited constitutional function, we are not permitted to reject the Commission's valuation merely because of an erroneous method, it is our duty to look at the result obtained by the Commission and to contrast it with other standards of valuation appearing in the evidence.[11] Looking at the result reached by the Commission's method we find that it contrasts very sharply with other valuations in this case. In our

---

[10] For illustration, see Plaintiff's Exhibit A 37.

[11] In Los Angeles Gas & Electric Co. v. R. R. Comm., 289 U. S. 304, 53 S. Ct. 637, 643, 77 L. Ed. 1180, it was said: "The legislative discretion implied in the rate-making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative de-

termination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question."

opinion it produces an unreasonably low valuation.

██ Counsel for the Commission contend that the court may not disturb the Commission's valuation unless the Company has proved *beyond a reasonable doubt* "that the Commission has been wrong to such an extreme degree that in the light of all present circumstances, no reasonable body of men could have reached such a conclusion." But the law is otherwise. On the issue of confiscation the Court must exercise its own independent judgment of law and fact. Ohio Valley Water Co. v. Ben Avon, 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908; United Railways v. West, 280 U. S. 234, 251, 50 S. Ct. 123, 74 L. Ed. 390; State Corporation Comm. v. Wichita Gas Co., 290 U. S. 561, 569, 54 S. Ct. 321, 78 L. Ed. 500.

Another objection to the method used is the highly variable results by the application of the method in a period (such as the present) of changing prices. We have above noted the increase in valuation by the application of the "all commodities" index, of nearly $2,000,000 occurring in the single year of 1933. If the present general upward trend of prices continues (and there is very determined public policy to make it do so), the Company would clearly be entitled in another year or two to a new valuation of its property on this method as it is undoubtedly the law, as pointed out by counsel for the Commission, not only that rate valuation must be based largely on present price but also "it is well established that values of utility properties fluctuate, and that owners must bear the decline and are entitled to the increase." McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 148, 71 L. Ed. 316.

The Commission's method of valuation is also erroneous in its assumption that Telephone Company property fluctuates approximately in accordance with general conditions. There is much evidence in the case to the contrary, and this is to be expected in the case of a utility subject to Commission regulation. The maximum earnings of utility companies by law never attain the peaks realized in general trade and business. Nor in time of depression do their earnings fall in proportion to that of general business. The service afforded by a well-managed utility is a common necessity for which there is a comparatively constant demand. Thus we find that despite the onset of economic depression in 1929 the volume of the Telephone Company's business constantly increased through 1930 and 1931, reaching its peak in the latter year; and it was not until 1932 that the earnings began to decline. And since January 1st last, the growth has again begun and is so marked that counsel for the Commission in argument notes an increase in net operating income of more than $300,000 is indicated for the current year.[12]

---

[12] The net earnings of the plaintiff company have been relatively stable even during the depression. See Plaintiff's Exhibit A 5. It appears therefrom that the percentage of net telephone revenues to average plant in service undepreciated for the years 1924 to 1932, inclusive, were as follows: 1924—4.71%; 1925—6.36%; 1926—6.98%; 1927—6.08%; 1928—6.62%; 1929—6.71%; 1930—6.54%; 1931—6.85%; 1932—5.78%; and, as appears from the testimony of Mr. Gretz on cross-examination in relation to this exhibit, if the percentages were calculated on cost less depreciation reserve, they would have been respectively as follows: 5.93%; 7.81%; 8.43%; 7.40%; 8.09%; 8.29%; 8.10%; 8.41%; and 7.10%.

The relative stability of telephone business generally also appears from Defendant's Exhibit D 12, pages 18 and 19, where, in a comparison of the trend of corporate earnings of various industries, it appears that for 15 telephone and telegraph companies the ratio of decline in earnings from the peak of 1929 to the end of 1932, was from 100 to only 73, with a similar decline of 45 electric light and power utilities from 100 to 76; which contrasts with much greater declines in other industries, for instance, automobiles and trucks declined from 100 to minus 11; and electric equipment generally declined from 100 to 7; and railroad equipment generally declined from 100 to minus 19; and even cigarettes and tobacco from 100 to 56. And on the following page 19, the statistics for net earnings of various industrial groups show 25 telephone companies in the Bell System had net earnings in 1929 of $217,105,000 which fell to only $139,336,000 in 1932; while very many industries showed absolute loss in large amounts for 1931 and 1932, and the decline for the industries generally was very much sharper than in the case of telephone companies. See, also, the same Exhibit page 20 showing that companies engaged in "communications" had, as percentages of income in 1932, 73.2% of 1929, and electric light and power companies had a similar percentage of 74.3%, both of which were higher than any other industries listed with the exception of "government" which would seem to be noncomparable. The data on this tabulation is said to have been compiled by the U. S. Department of Commerce with the co-

Despite the relative stability of earnings of publicly regulated utilities and particularly well-managed telephone companies as shown by the evidence in the case, it seems to be the theory of the Commission that there is something surprising and artificial in the trend of costs for telephone equipment and construction. Thus emphasis is laid on the comparison of the trend of telephone costs with that of other price trends. This is graphically shown in the Commission's chart opposite page 29 of its opinion where it appears that from 1923 to 1932 the trend of telephone costs is much flatter than that of all-commodities and other price curves. This Telephone Company composite trend is shown by the evidence to have been based on the local wage rate paid by the Telephone Company and current prices of the Western Electric Company for telephone apparatus and equipment. The price trend of the Company's wage rate in comparison with the price trend of Baltimore wage rates used by the Commission appears from Plaintiff's Exhibit A 46. For reasons already indicated we see no reasonable objection to the use by the Company of its average actual wage rates in estimating cost of reproduction adjusted as mentioned above.

## Western Electric Prices.

There is much testimony in the record as to the relationship between the local Telephone Company and the American Telephone & Telegraph Company, and the Western Electric Company. All the common stock of the local Telephone Company is owned by the A. T. & T. Co., which also owns or controls 21 local telephone companies throughout the United States, constituting 75% of all the telephone business in the country. The A. T. & T. Co. also owns practically all the stock of the Western Electric Company which in turn manufactures and sells telephone apparatus and equipment to the 21 associated companies known as the Bell System; and this constitutes the very much greater portion of the entire business of the Western Electric Company. It is obvious that the A. T. & T. Co. has effectual control over the whole business and the Western Electric Company is in substance its manufacturing department for the supplying of telephone apparatus and equipment to the Bell Companies, including the local company. For many years past practically all the supplies of the local company have been purchased from the Western Electric Company and the Company's estimated cost of reproduction is based on the *present prices* of the Western Electric Company. As the latter is not directly subject to Commission regulation, it is apparent that the A. T. & T. Co. has the power, if it chooses to exercise it, of dictating a price schedule for the Western Electric Company which might be both arbitrary and unreasonably high if chargeable to the expenses contributed by the public through the rates. The situation is one which obviously justifies the closest scrutiny by the court to ascertain whether in fact the prices charged for telephone equipment and apparatus have been unreasonably high and therefore detrimental to the public. In this case the Telephone Company has assumed the burden of producing evidence to show that the power has not been unfairly used and that Western Electric Company prices have in fact been consistently and uniformly fair to the public. Testimony of the witnesses Crosland and Cox deals extensively with this subject, and during the course of their testimony numerous exhibits were introduced showing the contractual relations between the Western Electric Company and the several American Telephone Companies, including the local Telephone Company.[13] It

---

operation of the National Bureau of Economic Research.

[13] See Plaintiff's Exhibits A 11 to A 28, both inclusive, and A 50 to A 53; and Defendant's Exhibit D 8, as explained in the oral statements of the witnesses Crosland, Cox, and Smith.

Prior to a few years ago a license fee of 4½% of revenues was paid by the local company to the A. T. & T. Co. The fairness of this amount was questioned by the Maryland Commission. Several years ago the amount of the annual payment was voluntarily reduced to 1½% and the fairness of the annual payment on this basis has not been challenged by the Commission in this case.

In the 1920 case the Maryland Commission, at page 15, said:

"The Company was required to and did file with the Commission its agreement with the Western Electric Company. The Western Electric Company is a corporation with its stock ownership lodged entirely in the American Telephone and Telegraph Co. It manufactures standard Bell telephone equipment and acts as purchasing agent for the local and other companies of the System. With the establishment of such an adjunct to the business, and the conduct of a separate but exclusively owned manufacturing purchasing agency, no fault in principle can be found. So far as the Commission has been able to find, the local

232

appears from the uncontradicted evidence that Western Electric prices to Bell Telephone Companies in general have been lower than its prices to other customers; and also prices charged for similar telephone equipment by other companies manufacturing and selling telephone equipment (independent of the A. T. & T. Co.) which supply most of the needs of the telephone companies outside of the Bell group, have generally been materially higher than those of the Western Electric Company. It is said, however, by counsel for the Commission that the very great dominance of the Western Electric Company in the particular field of manufacture is such that the competition of the independent companies is apparent rather than real.

The Commission's objection in essence is that Western Electric prices are not subject to the play of open market competition; and much evidence pro and con by the respective parties has been introduced bearing on the question of whether profits of the Western Electric Company from the sale of telephone apparatus and equipment to Bell Companies have been unreasonably high or not.

But in the view we take of this case this sharp controversy has little practical importance here because we are concerned with the subject only in so far as Western Electric prices affect the valuation of the local company's property. With relation to valuation based on historical book costs, counsel for the Commission do not attack the reasonableness of prices which the Company has in the past paid for its telephone material, and no figures have been submitted in evidence as a basis for any deduction from historical book cost on this account. Nor is it contended that the net earnings of the Company should be increased on this account. And indeed the only specific complaint made by the Commission about Western Electric prices is that the Company's estimate of reproduction cost is based on the *present prices* of Western Electric which include a raise in the prices

of about 10% effective November 1, 1930. But, as already noted, if the Commission's contention on this point is sustained, the effect is limited to a reduction in the amount of $1,500,000 from reproduction cost, and, for purposes of comparison with book costs, we have given effect to the contention.[14]

### The 1925 Court Case.

██ It is urged upon us that we should not disturb the Commission's valuation in this case because it resulted from substantially the same method applied by the statutory court here in 1925. (D. C.) 3 F.(2d) 938. And indeed something in the nature of an estoppel by judgment or verdict is sought to be maintained against the Company, although the decree of the court was in its favor on the issue presented. Neither party appealed from the decision. The contention is, however, clearly untenable. New York Tel. Co. v. Maltbie, 54 S. Ct. 443, 78 L. Ed. 1041, Feb. 19, 1934; State Corporation Comm. v. Wichita Gas Co., 290 U. S. 561, 569, 54 S. Ct. 321, 78 L. Ed. 500. Doubtless the Commission felt legally justified in following what it apparently understood to be the basis of the court's decision in 1925. It is true that the court did reach its valuation by applying the all-commodities index to the book value of the property in 1914 with the annual net additions thereto. This resulted in an increase of something over $5,000,000. And it is plausibly contended by counsel for the Commission that a rule applicable in a situation of rising prices should likewise be applicable where the price trend is reversed. It is clear, however, the reasoning of the decision, apart from the actual order which enjoined the Commission in that case, is not res adjudicata here. And an analysis of the opinion, we think, shows that the situation then dealt with by the court was materially different from the present one. At that time it seemed apparent to all that the rise in prices during and following the World War (with a temporary recession in 1920 and 1921) had in 1925 assumed a perma-

company secures its apparatus at less than the prices charged companies not associated with the Bell System. The advantages of buying general supplies in large quantities for all the Bell companies are apparent." See, also, New York Tel. Co. v. Prendergast (D. C.) 36 F.(2d) 54, 63; Illinois Bell Tel. Co. v. Gilbert et al. (City of Chicago, Intervenor) [D. C.] 3 F. Supp. 595, 602; Southwestern T. & T. Co. v. City of Houston (D. C.) 268 F. 878; affirmed 259 U. S. 318, 42 S. Ct 486, 66 L. Ed. 961; State v. Southwestern Bell Tel. Co., 115 Kan. 236, 223 P. 771.

[14] A graphic representation of the comparable price trends of all commodities with that of Western Electric prices is shown in Plaintiff's Exhibits A 50, 51 & 52, from which it appears that in the years of 1916 to 1920, the price trend of all commodities was very greatly higher than Western Electric prices, and again was materially higher in the years 1927 to 1930, but falling materially lower in 1931 and 1932. The curve for Western Electric prices also shows a rise in 1930 and a further rise in 1934.

nent new high level and the Company was therefore justified under the controlling decisions in having a re-valuation of its property. McCardle v. Indianapolis Water Co., 272 U. S. 400, 410, 47 S. Ct. 144, 71 L. Ed. 316. It submitted for the new valuation two estimates of cost of reproduction less depreciation, one more than $42,000,000 and the other more than $38,000,000, when the book cost of $28,853,901 less depreciation reserve of $6,022,854 was only $22,831,047; and the total amount paid in and invested in plant, $21,356,366. It appears from the opinion that the court regarded the cost of reproduction as extravagantly high and was unwilling to accept what it regarded as an excessive valuation but recognized that some increase in valuation was required. It therefore turned to the only other available evidence in the case indicative of price change which appeared in the index figures of the Department of Labor, approved by Dr. Hollander, the well-known economist of the Johns Hopkins University, as being on the whole a fair measure of the value of the dollar. With respect to his testimony the court said [(D. C.) 3 F.(2d) 938, 947]:

"He accepted the index figures of the Department of Labor, used by Mr. Collins, as being on the whole a *fair measure of the value of the dollar*. He also testified that for two years those figures indicated that its value had been stable, and he gave strong reasons why, in his opinion, that stability was likely to continue for a number of years to come, although, with scientific caution, he did not commit himself to any prophecy on the subject.

"As has already been said, no attempt was made to contradict this testimony or to weaken its force. It is so much in common with the conclusion of all observing men that we feel constrained to accept it, and consequently to put aside the suggestion that speedy return to anything like pre-war prices is at all probable." (Italics supplied.)

It appears that the same index figures were used by, first, Collins, the Commission accountant, second, Gretz, the Company's accountant, and finally by the Court, to pro-

duce three very different results. Collins' valuation was but $1,600,000 more than book cost, but Gretz calculated the value to be $38,167,548, and the court reached a value of $36,122,912, all undepreciated. It does not appear from the opinion that the Company offered the index figures as the measure of value but rather as partial confirmation of its cost of reproduction new. In reaching its final conclusion on valuation the Court noted that both parties accepted the index figures as accurate, and was careful to say:

"We do not wish to be understood as holding that under all, or perhaps under many, circumstances the most accurate valuation can be obtained by the use of such figures. All that we decide is that the evidence of reproduction cost demonstrates that world-wide conditions of which all men have knowledge have greatly increased the apparent value of this Company's property as measured in dollars, and that, from all that has been submitted to us, it so happens that in our best judgment the amount of that increase can be most accurately measured by the use of such figures. It follows that we find that the new or undepreciated value of the Company's property on the 31st of December, 1923, was $36,122,912."

It clearly appears that the use of index figures was not the subject of contest in 1925 that it now is in this present case; and they were used in 1925 only because the evidence afforded no other guide to valuation except the cost of reproduction which was regarded as extravagantly high. Fortunately, now, under different conditions, we are confronted with no such poverty of choice.[15]

Another important difference between the situation in 1925 and now is that it was then reasonably thought a new permanent price level had been reached of which the index figures might be regarded as fairly indicative. But here we are in a period of changing prices and the all-commodity index for 1932 is clearly not a just index factor for prices today when there has been already a very substantial rise as compared with 1932, and there is a determined public policy to effect a continuance of the price rise with the object of re-

[15] There is apparently no other reported case in which index figures have been used in valuation of public utility property in the way they were derived and applied by the Commission in this case. Compare Wash. Heights v. N. Y. Edison Co. P. U. R. 1932 E. 218; Re Ohio Bell Tel. Co. (1934) 2 P. U. R. (N. S.) 113; United Fuel Gas Co. v. P. S. C. W. Va. (D. C.) 14 F. (2d) 209, opinion by Circuit Judge Rose.

Of course, the trend of prices as indicated by index numbers may be a relevant fact for consideration with all other evidence in a case, as a check on other figures, or evidence of a general economic condition or changed price level. Clark's Ferry Bridge Co. v. P. S. C. of Penna., 54 S. Ct. 427, 78 L. Ed. 767. (Supreme Court, Feb. 5, 1934).

gaining the price level of 1926, with recent governmental action in reducing the gold content of the dollar to about 60% of its former value to aid in accomplishing the purpose.

But while we feel obliged to reject the Commission's valuation we wish to make it plain that we have carefully considered as relevant to the case the testimony offered on its behalf in relation to the subject. Its general effect is undoubtedly to substantiate in detail, what indeed is common knowledge, that the general price level sharply declined from 1929 to 1932. And this fact has been authoritatively judicially recognized in recent cases. Atchison, Topeka & Santa Fe R. R. Co. v. Interstate Commerce Comm., 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273; Central Ky. Natural Gas Co. v. R. R. Comm., 290 U. S. 264, 274, 54 S. Ct. 154, 78 L. Ed. 307; Los Angeles Gas & Electric Co. v. R. R. Comm., 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180. As appears from an earlier portion of this opinion, we have given practical effect to this general economic condition in the valuation that we deem correct. It also has importance in determining the rate of return.

## Property at St. Paul and Pleasant Streets.

The Commission excluded from the rate base a lot of land with building in a congested portion of the City which the Company had acquired some years ago with the intention to build thereon a branch exchange, which has, however, not yet been done. The Commission's view was that the property was not used or useful in the public service. But the testimony shows that the outlay for the property was a reasonable exercise of business judgment and that the Company still intends to put it to the use for which it was originally purchased. Probably the business depression of the last few years has caused the delay. We think it should not be excluded from the rate base. The amount involved is not sufficient to alter the result. It cost the Company $204,000 in 1923 and is now valued by the Commission at $137,000, and by the Company at $175,000.

## Working Capital.

█ To the fair value of the property as we find it to be, there must be added and included in the rate base a reasonable sum for working capital. The Company claims an allowance of $1,615,072. The Commission allow-

ed $660,863. In 1916 when the property of the Company was less than a quarter of its present size, the Commission allowed $500,000; in 1924 on a value of about $23,000,000, the Commission allowed $975,000 and after the court's decree increased the allowance by $75,000. The reasons for the decrease made by the Commission in this case are stated in its opinion. Included in working capital is the value of materials and supplies, as claimed by the Company before the Commission, amounting to $407,452. Of this amount the Commission disallowed $158,048, on an understanding of the facts shown to have been incorrect by the testimony in this case. Restoring this item and otherwise adopting the Commission's determination brings the amount to $818,911. The Company points out that under practical working arrangements throughout the state it keeps substantial sums of money on deposit in 71 depositories as a matter of convenience in meeting local expenses and in consideration of the performance of various clerical services in receiving payment of bills and otherwise, by these bank officials. We think a reasonable additional sum should be added to working capital on this account, and conclude that under all the circumstances the total sum of $1,000,000 for working capital will be reasonable at the present time. We have accordingly included that amount in the rate base.[16]

## Depreciation Annuity or Expense.

Before considering the practical effect of the Commission order for the reduction of rates, it is necessary to determine from the evidence the probable net earnings of the plaintiff for the coming year. The Commission's estimate was necessarily limited to 1932 but as the total figures for 1933 are now available and rates for the future must depend upon the earnings for 1934 and subsequent years, it is necessary at the present time to ascertain from the evidence the probable net earnings for 1934, especially as both parties now contemplate a substantial increase over 1933. The Company estimates its gross revenues for 1934 at $12,700,250, an increase of about $300,000 over 1933. It estimates current expenses at $10,131,245, thus indicating a probable net revenue of $2,569,005. The Commission's estimate of net revenue for 1934 is $2,959,093. The difference lies in two items of expense, taxes and depreciation.

---

[16] See Plaintiff's Exhibit A 33, and Defendant's Exhibit D 9, and Commission's opinion pages 57 to 60. The amount allowed is fairly comparable proportionately to property and business to the allowance made in the last N. Y. Tel. rate Case (D. C.) 36 F.(2d) 54, 64; and in the Chicago Case (D. C.) 3 F. Supp. 595, 601.

The tax item is estimated by the Commission to be about $60,000 more than the Company's estimate. This is doubtless due to the higher net revenue as estimated by the Commission. The bulk of the difference in the estimates is in the one item of depreciation where the Company claims an expense of $2,173,000 against an allowance by the Commission of $1,720,724. Alternatively the Commission allowed for depreciation expense only $1,352,-284, but this computation was the result of calculating depreciation expense on the reduced valuation of $32,610,327. As we determine the rate base to be cost less depreciation reserve (without working capital, for the computation of depreciation expense) it is evident that the higher alternative figure of $1,720,724, as estimated by the Commission where depreciation is computed on undepreciated cost (as has been uniformly done in the past) must be the correct figure for the Commission's computation. (See Plaintiff's Exhibit A 43, and Defendant's Exhibit D 14.)

The Commission's figure of $1,720,724 is reached by applying what it considers proper depreciation rates for the several property accounts of the Company. (See its opinion page 48.) The average as estimated by the Commission for all depreciable property is 3.45% of the plant cost. The Company claims, however, the higher average rate of 4.38% (Plaintiff's Exhibit A 4). Both are only estimates for the future based on opinion evidence of experts. Past experience is a most important guide where there has been no important change in conditions. Here, however, it is conceded by both sides that an important change has recently taken place. In past years the rate of depreciation expense has been materially affected by the factor of inadequacy of equipment caused very largely by the continual progressive growth in the size of the business; but this factor ceased to be operative with its prior force in 1932 and 1933 when the growth of the Telephone Company temporarily ceased and instead of gaining additional telephone subscribers and stations there was a decrease in the total number of stations of about 10%. The Company itself has appreciated the importance of this changed situation and has voluntarily decreased its annual charge for depreciation expense for 1933 to the extent of over $300,000, representing a decrease in the composite average depreciation rate, based on plant in service, from 5.15% to 4.38%. As the issue in the case is confiscation, the burden of proof is on the Company to convincingly demonstrate the necessity for the larger allowance from revenues for depre-

ciation expense than that allowed by the Commission. The Company has attempted to sustain its contention by the testimony of Gompf, its engineer, and Woodford, a highly experienced depreciation engineer of the A. T. & T. Co. Their estimate of the necessary future allowances was based on a detailed study of the probable service life of the several elements of the telephone plant by Mr. Gompf, giving effect to experience of the past and the changed conditions above referred to. His testimony is illustrated by Plaintiff's Exhibits A 38 and A 39. The necessary depreciation expense for the future thus estimated compares very favorably with that of other Companies in the Bell System and is materially less than the average rate charged in past years. See Smith v. Ill. Bell Tel. Co., 282 U. S. 133, 158, 51 S. Ct. 65, 75 L. Ed. 255.

On the other hand the Commission has submitted in support of its estimate the testimony of Messrs. Pagon and Holland, competent general engineers, which is to the effect that, principally by reason of the changed condition referred to, a rate even lower than that adopted by the Commission would be sufficient. Their estimates are criticized by counsel for the Company chiefly on the ground that they assume the service life for many elements of the plant much greater than can be justified by any past experience, and give no effect in the present to inadequacy that may reasonably be expected in the future.

If the estimate for the future is to be based alone on the past experience of this Company, it cannot reasonably be found that the Company's estimate for the future is excessive. We have seen that prior to 1924 an annual depreciation rate of 6% was allowed by the Commission and continuously thereafter to the present time a rate has been permitted in excess of 5%, and with this rate in effect from 1924 to 1932, inclusive, the depreciation reserve in proportion to plant in service has remained fairly level at approximately 20%, which is the ratio determined to be proper by the Commission in several rate cases affecting the Company prior to and including the year 1924. Therefore, it cannot be said that prior to 1933 the depreciation reserve unduly increased under the rates then prevailing. (See Plaintiff's Exhibit A 4.)

But, as already noted, a material change in conditions occurred in 1932 and 1933. On December 31, 1931, the Company had in service 221,309 stations but the number declined to 208,159 on December 31, 1932, and to 199,127 on December 31, 1933, a loss in stations of about 10%. Concurrently there

resulted an important change in the relation of the depreciation reserve to the amount of plant in service. Thus the aggregate reserve increased from $10,229,980 in 1932 to $11,483,358 in 1933, a net increase of $1,253,378 in the accumulated depreciation reserve, thus increasing the latter in percentage of plant in service from 20.43% in 1932, to 22.97% in 1933. And at the same time it is to be noted that the progressive increase in the book cost of "total fixed capital and progress" which had increased from $28,003,479 as of December 31, 1923, to $49,991,946 as of December 31, 1932, was practically stopped, the figure as of December 31, 1933, being $50,025,278, a net increase of only $33,332. It thus appears that the Company took out of its revenues and charged to depreciation expense at least $1,250,000 in 1933 more than was necessary to preserve the level balance of 20% which, over a long period of years, had been determined by the Commission and found by experience to be a sufficient depreciation reserve for this Company. These figures are significant, and reasonably lead to the inference that the change in conditions owing to the halt in progress of the Company was of material importance.

But, on the other hand, too much reliance must not be placed upon the experience of a single year and that an exceptional one in the history of the Company, especially when it is borne in mind that the true nature of depreciation reserve is to build up a fund to take care of necessary future replacements and particularly to meet extraordinary conditions such as extensive damage by sleet storms which experience shows occur at uncertain times. Thus it may be pointed out that in 1924 the ratio of the depreciation reserve which was then 23.29% fell, without decrease in depreciation percentage rate allowed, to 18.69% in 1927, and thereafter, at approximately the same depreciation rate allowance, did not reach so much as 21% in any year prior to 1933.

Furthermore in the estimate of necessary depreciation expense for the future, it is of importance to ascertain the amounts of *realized* depreciation in recent years. Net realized depreciation consists in the charge to the depreciation reserve based on the cost of the plant retired from service plus the cost of removal and any extraordinary repairs, less the salvage value thereof. From the same Exhibit A 4, we find that the net realized depreciation for 1930 was $2,268,389; for 1931 it was $2,301,156, and for 1932 it was $2,294,292, while in 1933 it was $1,031,182. It thus appears that for three out of the last four years the amount of net realized depreciation was somewhat in excess of the Company's estimate for the necessary credit to depreciation reserve for 1934, to wit, $2,173,000, and very greatly in excess of the Commission's allowance of $1,720,724. If the experience for 1933 is to be disregarded as entirely exceptional, there is no reasonable basis for a reduction in the Company's estimate for 1934. Nor may we properly disregard the fact disclosed in the evidence that in the last few months the business of the Company is again on the upward swing, although whether the renewed impetus will be sufficient to materially overcome in the near future the recent past losses is still problematical. We are dealing here with the near and not the distant future. Even the Company's estimates of renewed growth do not indicate a return to conditions approximating those of 1931 for at least two or three years in the future.

Looking at the evidence as a whole we conclude that the Company has underestimated, while the Commission has overestimated, the effect fairly attributable to the Company's temporary partial loss of business in the past two years. As the proper depreciation allowance for the near future is, under the conditions now existing, necessarily an estimate only, it is obviously not susceptible of mathematical demonstration but should be the result of a reasonable judgment on consideration of all relevant facts. In our opinion the depreciation allowance at the percentage rate of 4% on the book cost of the plant now in service is reasonable and proper for the ensuing year. On this basis the allowance should be $2,000,000. The Company's estimate of net revenue for 1934 must therefore be adjusted by the addition of $173,000, thus making the estimated net revenue for 1934 $2,742,005.

This conclusion is, we think, not inconsistent with but rather confirmed by the luminous exposition of the subject of annual depreciation expense allowance to telephone companies in the very recent decision of the Supreme Court in *Lindheimer v. Ill. Bell Telephone Company* (Chicago Telephone Case), 54 S. Ct. 658, 78 L. Ed. 1182, decided April 30, 1934. In that case the court was dealing with the validity of the Commission's rates over a nine-year period in the past. Prior to the beginning of the litigation the Commerce Commission had ordered the Company to reduce its rates by an amount which the court found was somewhat less than the amount of excessive charges to the depreciation reserve which had been made by the Company for the several years in the past

under investigation. The principle announced and applied was that in a rate case where the rates fixed by the public authority are not in fact confiscatory unless the total amounts charged to depreciation expense by the Company can be established as necessary, the burden is on the Company to convincingly demonstrate the necessity for the amounts annually charged by it to depreciation expense. And it was held in that case the Company had failed to meet the burden of proof in this respect. The conclusion was based very largely on the striking contrast between the limited amount of accrued depreciation (only 8% as contended for by the Company) and the aggregate of the accumulated depreciation reserve which, over a period of years, had increased annually at the rate of more than $2,000,000 and represented for 1931, 26% of the book cost of the property; and was more than three times the aggregate of the Company's estimate of actual existing depreciation.

█ In this aspect, there is a marked difference in the facts between the experience of the Chicago Company with respect to its accumulated depreciation reserve, and that of the C. & P. Telephone Company of Baltimore. In the Chicago Case the evidence required the conclusion that depreciation reserve had been accumulated at too high a rate over a long period of years in the past. In this case that situation does not exist as the history of the Company, in the matter of the reserve, indicates quite clearly the contrary up to 1933. However, our special inquiry here is with the future rather than with the past. Whether the rates for depreciation have been too great or too small heretofore is not the controlling consideration. The question is what is a reasonable and proper allowance for the future. Clark's Ferry Bridge Co. v. P. S. C. of Penna., 291 U. S. 227, 54 S. Ct. 427, 78 L. Ed. 767; Smith v. Ill. Bell Tel. Co., 282 U. S. 133, 158, 51 S. Ct. 65, 75 L. Ed. 255.

### Rate of Return.

█ We have found the rate base for the whole property to be $39,541,921.27, and the net income to be $2,742,005. Reducing the

figures in accordance with the stipulation to 85% thereof, as applicable to the intrastate property and business, we have $33,610,632 for property and $2,330,704 for net income. The order of the Commission requires a reduction of $850,000 in net revenue, which would leave the Company $1,480,704, a return of less than 4½% on the fair value of the property. Even if we should accept the lower estimate of the Commission for annual depreciation expense (to wit, $1,720,724) the net revenue available for return on the value of the Company's property, would be less than 5%. Counsel for the Commission concede that any rate less than 5½% under present conditions would be confiscatory. It necessarily results that the enforcement of the order of the Commission must be enjoined.

Here our constitutional function properly ends, but for the purpose of avoiding possible further litigation, and as customary in these rate cases, we will say that in our opinion, based on the evidence in this case, in the light of economic conditions generally which have prevailed in the last few years, and to a considerable extent are likely to continue for the coming year, if not longer, a return of 6% would not be confiscatory. If a return of 6% on $33,610,632 ($2,016,637) is deducted from the intrastate net revenue of $2,330,704, there remains $314,067 as a maximum possible rate reduction in the net revenues of the Company (probably about $375,000 in gross revenues) from intrastate business, if the Commission deems it wise public policy to reduce the revenues to that extent, as to which we express no opinion. Nor do we mean to indicate that under changed economic conditions rates which would yield only 6% return to the Company would not be confiscatory. As pointed out by counsel for the Commission 6% returns to well established public utilities were commonly held nonconfiscatory during pre-war levels of prices; while in later years, in particular cases, returns of 8% were allowed, but in the present depression years returns have generally been lower, in some cases less than 6%.[17]

With the rate base re-established on the basis heretofore approved by the Commission (and accepted by the Company prior

[17] In the Chicago Telephone Case (D. C.) 3 F. Supp. 595, 606, the rate of return allowed for the years 1923 to 1927, inclusive, was 7½%; for 1928 to 1930, 7%; for 1931, 6½%; and for 1933, 5½%. The court fairly said:

"A public utility enjoying the advantages of plaintiff is not entitled to the large earnings made by many undertakings during periods of great prosperity.

On the other hand, its return in times of business adversity should not be reduced to the extent that the earnings of many private corporations have been impaired. The range of from 7½ per cent. to 5½ per cent. as found in this case gives weight, in our opinion, to all of the elements which under the ruling of the Supreme Court we are required to consider."

238

to 1925) it is reasonable to anticipate that further valuation proceedings (with the expense and delay occasioned thereby) will be unnecessary and that future revision of the rates, if necessary, can well be related to adjustments of the rate of return to be allowed the Company from time to time. The Commission allowed the Company a return of 8% in 1912 and again in 1916, effective until 1920, when it was reduced to less than 6%, which in 1924 probably occasioned the demand by the Company for an increase in its rates and, when refused by the Commission, led to the court litigation, resulting in an increase in the rate base, but with a return limited to 6%. It may be noted that, if the Commission in 1925, in view of the then prevailing economic conditions, had allowed the Company a return of 8% on the then long established rate base, the practical result would have been substantially the same, and the litigation probably avoided; and if the rate base had thus been continued without the increase then made, the Commission, in this case, by reducing the rate of return to 6%, in view of the prevailing economic conditions, would have produced practically the same result now attained. The principle involved is that when a rate base for a utility has been once fairly established, changes in rates necessary from time to time in the interest of the public or the Company, can nearly always be effectively made by adjustment of the rate of return, without the expense of a new valuation proceeding.

It results from our opinion that the plaintiff is entitled to final injunction against the enforcement of the order of the Commission.

We express our indebtedness to counsel for the parties for their evident thorough preparation of the case for our consideration and for their well presented oral arguments and briefs.